### ADAMS et al. v. BORTZ.

(Circuit Court of Appeals, Second Circuit. February 6, 1922.)

1. Shipping ⊙⇒121(1)—Vessel is "seaworthy" as to cargo when reasonably fit to carry the particular cargo.

With respect to the cargo it offers to carry, a vessel is "seaworthy" when it is sufficient in materials, construction, equipment, officers, men, and outfit for the trade or service in which it is employed, having in mind the higher requirements occasioned by the development of trade and commerce.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Seaworthy—Seaworthiness.]

2. Seamen ⊙⇒9—Vessel is "seaworthy" when equipped with reasonably safe appliances.

To render a vessel seaworthy with respect to her crew, she must be reasonably safe, and equipped with reasonably necessary and customary requisites and appliances, but she is not required to have the best appliances.

3. Seamen ⊙⇒29(5)—Evidence held not to sustain jury's finding extra coal bin was not reasonably safe.

In an action for injuries to a ship steward, where the only ground for unseaworthiness submitted to the jury was the construction of an extra coal bin on the poop deck, which the steward had to cross over in going from one part of the vessel to another, there was no evidence that the bin and stairway over it were not reasonably safe for the performance of the duties required of the steward.

In Error to the District Court of the United States for the Eastern District of New York.

Action by Titus L. Bortz against Charles F. Adams and others, as trustees, doing business under the firm name and style of the New England Fuel & Transportation Company. Judgment for plaintiff, and defendants bring error. Reversed.

⊙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Defendants owned the steamship Malden and employed plaintiff in June, 1919, as chief steward for a voyage to one or more European ports and return. The complaint alleged that, when the vessel was on the high seas, plaintiff while in the performance of his duties sustained injuries to his right knee, "in falling from a temporary coal bin on the main deck, after part of said vessel, by reason of the failure of the defendant to provide proper and safe life lines, ropes, or guards at or about the said coal bin, and further that the said coal bin was of improper construction and design, thereby rendering the said vessel unsafe and unseaworthy."

The Malden had been usually employed in the coastwise trade, but prior to the voyage on which plaintiff was injured she made two European trips. For these trips there had been erected on the poop deck a coal bin to carry an additional amount of coal by way of precaution. The poop deck was about 9 feet above the well deck, and the top of the bin was about the same distance above the poop deck.

In the course of his duties, it was necessary for plaintiff to carry stores from a storeroom, which was amidships, to the galley, which was aft on the poop deck, and thus to cross over the top of the coal bin. To do this he had to go up from the well deck by the ship's regular stairway to the poop deck, and then up the stairway leading from the poop deck to the top of the coal bin. The regular stairway from the well deck to the poop deck ran fore and aft. The temporary stairway from the poop deck to the top of the coal bin ran athwartships.

Plaintiff testified that on September 18, 1919, at about 4:30 p. m., when the ship was on the high seas, he was taking three cans of preserved fruit from the storeroom to the galley, and "while going up the temporary ladder, to the temporary bin, I got to the top step, and the ship rolled, and I was holding onto the bit of handrail with one hand, and the three cans of peaches with this hand (indicating the left hand), and having it hugged up to me, and I was at the top step, and felt the ship start to roll, and was holding on with the right hand to the bit of railing that was running from the top of the bin to the top of the step, and the ship rolled and swung me around like that (indicating backwards to the left), and here there was a little handle, between the top of the bin and the step; there was a handle to get hold of, and I was holding onto that, and it came off. * * * I fell from the top of the steps to what you call the funnel deck, 9 feet. * * * I struck the winch first, and fell on the deck."

The testimony as to the handle of the handrail was stricken out, because no claim had been made in the rather full bill of particulars as to any defect in or insufficiency of the handrail, and the court expressly charged that there was no evidence that the "coal bin itself was in an improper state of repair, and no recovery can be predicated upon that specific allegation." There was no evidence that the construction was not usual nor customary. One Wilhelm was called, presumably as an expert, but after exclusion of certain questions and answers his testimony was a blank.

The result was that, when the case was sent to the jury, there was no evidence that the temporary stairway was not properly constructed for its purpose of enabling the ship's officers and men to go up and across the bin when occasion required. Defendants rested on plaintiff's case, and the appropriate motions to dismiss and for the direction of a verdict were made, and exceptions duly taken.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Vernon S. Jones, of New York City, Raymond Parmer, of Brooklyn, N. Y., and L. De Grove Potter, of New York City, of counsel), for plaintiffs in error.

Silas B. Axtell, of New York City (Warren Bigelow, of New York City, of counsel), for defendant in error.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

MAYER, Circuit Judge (after stating the facts as above). The sole question which the jury was instructed to consider was whether the vessel was seaworthy, not by reason of any defect in the construction of the coal bin or the temporary stairway, but because the bin was so situated as to make it necessary for plaintiff and others to climb or cross over it. The question is exposed by the following part of the court's charge:

"If you find that the evidence shows that the coal bin was so constructed that no safe passageway was provided on the deck, and that it was made necessary to climb or cross over said bin in the performance of his duty, then you are to determine whether or not the defendants failed in their duty. It is further claimed that the defendants were negligent in placing the coal bin on the deck, which rendered free and easy access to all parts of the coal, unsafe and dangerous. It is for you to determine whether there was such free and ready access to all parts of the deck, unhampered by the presence of the coal bin, as created a dangerous condition in connection with going from one part of the vessel to the other."

"Seaworthy" and "unseaworthy" are words which may be easily defined by general language. The difficulty arises when it is sought to fit facts to definition or apply definition to facts. An appreciation, therefore, of the history of these terms and of their application to new requirements, helps serve to understand their true significance. The basic thought is that the vessel shall be equipped to perform the duty which she owes to the human beings aboard of her and the cargo which she carries. As far back as the Laws of Oleron, it was recognized that the ship must be fit for something more than encounter with the perils of the sea. In article X (30 Fed. Cas. 1176) it was provided:

"The master of a ship, when he lets her out to freight to the merchants, ought to show them his cordage, ropes, and slings, with which the goods are to be hoisted aboard or ashore; and if they find they need mending, he ought to mend them. * * * So also if the ropes or slings break, the master not showing them beforehand to the merchants, he is obliged to make good the damage."

Cf. Laws of Wisbuy, 20 Fed. Cas. p. 1191.

While article X does not use the word "seaworthy," it nevertheless, in effect, prescibed as a rule of conduct that a ship, in order to be seaworthy in certain relations to cargo (i. e., hoisting aboard or ashore), must have the equipment to carry on the hoisting with reasonable safety.

[1] However, in respect of cargo in the earlier days, controversies as to seaworthiness related, in the main, to the hull and—

"to constitute seaworthiness of the hull of a vessel in respect to cargo, the hull must be so tight, staunch, and strong, as to be competent to resist all ordinary action of the sea, and to prosecute and complete the voyage without damage to the cargo under deck." Dupont de Nemours & Co. v. Vance et al., 19 How. 162, 167, 15 L. Ed. 584.

After The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181, had held that the Harter Act had not released the owner of the ship from the duty of making her seaworthy at the beginning of the voyage, the Supreme Court was again called upon to define seaworthi-

ness in respect of cargo, and thus in The Silvia, 171 U. S. 462, 464, 19 Sup. Ct. 7, 8 (43 L. Ed. 241), Mr. Justice Gray wrote:

"The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport."

Five years later, in The Southwark, 191 U. S. 1, 24 Sup. Ct. 1, 48 L. Ed. 65, the court was confronted with an illustration of the requirements of modern commerce in respect of a refrigerating apparatus on a vessel engaged in the dressed meat trade, and the court held that seaworthiness of such a vessel related and extended to the refrigerating apparatus necessary for the preservation of the meat during transportation. Realizing that seaworthiness, like many other elastic terms, must keep pace with progress, the court recognized the importance and growth of our foreign commerce in dressed beef and adopted the following definitions:

"Bouvier's Law Dictionary defines 'seaworthiness' to be: 'In maritime law, the sufficiency of the vessel in materials, construction, equipment, officers, men and outfit for the trade or service in which it is employed.' And the same author further says: 'It can never be settled by positive rules of law now far this obligation of seaworthiness extends in any particular case, for the reason that improvements and changes in the means and modes of navigation frequently require new implements, or new forms of old ones; and these, though not necessary at first, become so when there is an established usage that all ships of a certain quality, or those to be sent on certain voyages or used for certain purposes, shall have them.' In the case of The Sylvia, 171 U. S. 462, Mr. Justice Gray said: 'The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport.' This is the commonly accepted definition of seaworthiness. As seaworthiness depends not only upon the vessel being staunch and fit to meet the perils of the sea, but upon its character in reference to the particular cargo to be transported, it follows that a vessel must be able to transport the cargo which it is held out as fit to carry or it is not seaworthy in that respect. But for the special appliances furnished by the vessel, perishable cargoes, such as dressed beef, could not be shipped on long voyages in hot weather."

Since The Southwark, the courts have applied its principles and definitions in a great variety of cases involving differing sets of facts. The definitions were not new, as is evidenced by the quotations from Bouvier, but their application was brought up to modern developments in emphasizing the duty of the owner to equip his vessel for the service which it undertakes.

[2] Almost contemporaneously with the decision in the Southwark Case was that in The Osceola, 189 U. S. 158, 175, 23 Sup. Ct. 483, 47 L. Ed. 760, in which, after an exhaustive review, the court considered as settled the proposition:

"That the vessel and her owner are, both by English and American law, liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship."

The court distinguished, as indeed did Judge Addison Brown himself, The Edith Godden (D. C.) 23 Fed. 43, from the City of Alexandria (D. C.) 17 Fed. 390. In The Edith Godden Case, supra, Judge Addison Brown said:

"There is no question that in modern maritime law, the owners are responsible for due care and diligence in the proper equipment of the vessel for the contingencies of the voyage."

And in The Frank and Willie (D. C.) 45 Fed. 494, 496, the same judge concisely stated:

"The principle involved, viz. the duty to provide reasonable security against danger to life and limb, by at least the usual methods, when these dangers are brought home to the knowledge of the proper officers, is manifestly a general one."

Collating and referring to many cases, 35 Cyc. 1196, well defines the duty of owners to seamen in this respect as follows:

"A shipowner, among other obligations to the seamen, is bound to provide a seaworthy ship, furnished with all necessary and customary requisites for navigation, including proper equipment and a competent crew."

That a vessel is not called upon to have the best appliances is no longer a debatable question. The New York, 204 Fed. 764, 123 C. C. A. 214; In re Tonawanda Iron & Steel Co. (D. C.) 234 Fed. 198. And out of all these definitions there survives the proposition, which, like most elementary propositions, must be occasionally restated, that the equipment or appliance need be only that which is reasonably safe for its purpose. Seaworthiness thus remains "a relative term." Hanrahan v. Pacific Transport Co. (C. C. A.) 262 Fed. 951.

[3] Ships roll, and those who go to sea must have sea legs. Deck cargoes are old, and it matters not whether they consist of coal or machinery. A sudden lurch of the ship in a heavy sea might just as likely have thrown a seaman off his balance on a stairway below the poop deck as above it, and just as readily whether there was a handrail of iron or of wood. Thus the point is whether there was any evidence whatever as to the position and construction of this bin, or the construction of this stairway, from which a jury could determine that the bin and stairway on this freighter were not reasonably safe for the performance of the required and normal duties of this plaintiff.

We find no such evidence, and, while we appreciate, as pointed out, supra, the new illustrations which progress in shipbuilding and navigation present for disposition, we fail to discover in this case any question which calls for the application of other than now well-settled principles.

Judgment reversed.