## THE COMMONWEALTH.

District Court, D. Massachusetts. February 25, 1929.

No. 119.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for petitioners.

Sylvester M. Whalen, of Boston, Mass., for Theodore M. Christopher and others.

Harvey, Campbell, McLean & O'Keefe, of Boston, Mass., for Carolyn B. MacComiskey, Adm'x.

BREWSTER, District Judge. Early in the morning of April 8, 1927, fire broke out in the schooner Commonwealth. About an hour later 15 of the crew left the schooner in dories. The captain and 4 of the crew remained on the vessel and succeeded in subduing the fire, but not until such damage had been done to the schooner that all hope of saving her was abandoned. The vessel sank about 15 minutes after the remaining members of the crew had left. Those who remained on the vessel until the end were picked up, as were 3 others of the crew who had left earlier. The remaining members of the crew were lost. Numerous proceedings have been started against the owners of the vessel, and this proceeding is brought for limitation of their liability.

At the time of the loss the Commonwealth was owned by 13 persons, including the master of the vessel, Capt. Watts. Another of the owners was a Mr. Grueby, who was the managing owner. All the others having an interest in the vessel were merely investors in the enterprise, and never, at any time, had anything to do with the building, equipment, management, or operation of the vessel. Any alterations, repairs, or expenditures were made without their knowledge or expressed approval. Everything, including supervision, was left either to the master or to the managing owner. The manager was compe-

tent, and the investing owners could not be said to be at fault in selecting, or retaining, Mr. Grueby as the manager, or Capt. Watts as the master. Both were experienced men, capable of undertaking the duties and responsibilities of their respective positions. I find no evidence of negligence on the part of those responsible for the selection of the engineer.

The Commonwealth was a fishing schooner with auxiliary power. She was built and equipped in 1913 by competent and reputable concerns, doing business in Gloucester, Mass. She was the usual two-masted rig, 103 feet long and 24 feet in breadth. When first launched she was equipped with two 50 horse power gasoline twin screw engines. She was fully outfitted with all the equipment then usually found in newly built fishing vessels. This equipment included life preservers, axes, buckets, torches, foghorn, two pyrene fire extinguishers, and she was also equipped with a sufficient number of dories. Later a swivel gun was added to the outfit.

In 1919, in order to reduce the fire hazard, as well as to eliminate the injurious effects of gas fumes, the petitioners installed a crude oil fuel Diesel engine of 180 horse power at a cost of $25,000. This type of engine was the approved type for use in United States submarines and has been used in other fishing vessels. The complete equipment for this engine included one small gasoline engine, known as the Palmer engine. This was a one-cylinder engine, used for the purpose of pumping air into the bottles which were used to supply the air pressure necessary to vaporize the crude oil for combustion within the chambers of the Diesel engine. Ordinarily the main engine filled the bottles, and the Palmer engine was rarely used for that purpose, but if, for any reason, the pressure got too low, the Palmer engine was used. This engine was installed in a recess, or compartment, off the main engine room, and was supplied with gasoline from a drum securely fastened in the gurry kit on deck. The gasoline was conveyed to the engine through a 1/8-inch brass pipe, running from the drum down into the compartment and connecting directly with the carburetor of the Palmer engine. Below the deck was a draw-off valve, or cock, from which the engineer could, if he chose, draw gasoline. The vessel was also supplied with approved gasoline containers, known as "safety cans," which were wholly air tight, except when gasoline was being poured into, or out of, the can.

In 1924, a lighting plant was installed on the schooner at the request of the crew, and was paid for out of their share of the proceeds of the catch. This plant was what is known as a two kilowatt or unimote generator. It consisted of a gasoline engine and generator in one unit and four storage batteries. The engine was only run when necessary to charge the storage batteries. The gasoline supply for this engine was pumped into the carburetor from a reservoir, which constituted the base of the engine. There were means for carrying the overflow back into the reservoir. This reservoir contained about 2½ gallons of gasoline and was filled from the safety cans, already referred to, through a pipe over which a cap was screwed after the reservoir had been filled. Except when the reservoir was being filled, there was no way that gas or gasoline fumes could escape from this reservoir. The exhaust was carried outside through the side of the vessel. This engine and motor were installed in the same compartment with the Palmer engine and placed on a shelf about 2 feet from the floor. The storage batteries were set on other shelves in the same compartment.

While it was apparent that danger of sparks from the brushes on the generator, or of flame from back-firing, had not been wholly eliminated, yet it was a lighting plant similar to those installed on numerous other fishing vessels.

When the Diesel engine was installed, the engine room was enlarged, and was about 18 feet long, 14 feet wide, 7 or 8 feet high, built of matched boards, with double partition from ceiling to floor, filled with asbestos, insulating the hold and wings from the heat of the engine room. There was a sliding door on the forward starboard side leading to the cabin. There was also a companionway, opening at the forward end, and a ventilator with a cowl through the top of the house, leading into the forward part of the engine room, and a hatch, with sliding top and steps, leading from the top of the house into the after part of the engine room.

Another engine had been installed after the vessel was first launched, which was used for hoisting and pumping or throwing water. It was frequently used in cleaning the fish. This engine was on deck and did not figure in the origin of the fire, but does become important when we consider the means available for extinguishing the fire. Dry batteries were used for ignition, and a booster coil was used to raise the voltage of the cells. These were kept in the engine room, when the engine was not in use, in order to keep them dry. The vessel was also equipped with two hand brake pumps, operating from the deck,

and with an electric rotary bilge pump in the engine room.

Coming now to the facts which relate to the fire, and the means taken to extinguish it, so far as disclosed by the evidence, I find that on April 7, 1927, 35,000 pounds of fish were caught, cleaned, washed, and packed away, and that the vessel jogged on the Banks throughout the night. A heavy sea was running, with snow squalls, and before the captain turned in he directed the watch to notify the engineer to start up the engine and put the vessel on another tack. One of the crew and a claimant here testified that he heard the engineer start up the engine some time after 3 o'clock on the morning of April 8. About 4 o'clock a. m. the engineer came rushing from the engine room into the cabin, awakening the captain and the other members of the crew sleeping there. The engineer's hands were burned, and the captain and boatswain saw sheets of flame in the engine room.

Capt. Watts testified that he asked the engineer how the fire started, and "the engineer said, 'Through a spark.' He said something about a wire—through a spark."

Immediately after the fire was first discovered, the engine room was filled with flames, and the cabin with smoke and heat. All of the members of the crew were awakened, and they began, with buckets, to pour water through the skylight, or hatch, over the engine room, in an attempt to quench the flames. The captain then undertook to smother the flames by closing all the openings and using blankets to fill the crevices. These endeavors were no more successful. The fire continued to make progress. During this period there was a great deal of confusion. No one seemed to be in command, and, according to the captain's own story, he did very little toward directing the activities of the fishermen in fighting the fire. It was impossible to use the pump operated by the hoisting engine, because the dry batteries and booster coil were below in the engine room, which was inaccessible on account of the fire. The flames, smoke, and heat in the engine room also rendered useless or unavailable the pyrene extinguishers and the electric bilge pump.

After working about an hour, 15 of the men left the vessel in dories, leaving the captain and 4 men on board. These men then proceeded to break holes through the deck over the engine room and maneuvered the vessel in such a way that the sea water was admitted into the burning compartment. After a time the flames were practically subdued, but in the process the vessel had shipped so much water that, unless it could be pumped out, there was immediate danger of the vessel foundering. The men undertook to work two hand pumps on deck, but these soon clogged up and refused to work, whereupon the remaining men decided on abandoning the vessel.

There was no defect known to the master, or to the managing owner, in the vessel or in any of the equipment on board. The petitioners showed affirmatively that the engine had been repaired just before the vessel left Boston, that the lighting unit, engine and motor, had been taken out and thoroughly overhauled, and worn parts replaced, only a few weeks before the disaster; that the hand brake pumps had been repaired and put in good working condition, and one of these had been operated on the trip without any indication of defective condition. There is undisputed evidence to the effect that the dry batteries for the hoisting engine were supplied by, or on behalf of, the crew and paid for out of their share of the proceeds of the catch.

The above findings of fact present the usual questions. Were the owners negligent, and, if so, are they entitled to the benefit of R. S. §§ 4283, 4284, and 4285 (U. S. Code, title 46, c. 8, §§ 183–185 [46 USCA §§ 183–185]), relative to limitation of liability?

I find no negligence on the part of the owners resulting from a failure to provide a seaworthy vessel. Seaworthiness has been said to mean "efficiency of the vessel in materials, construction, equipment, officers, men, and outfit for the trade in which it is employed." The Llewellyn J. Morse (D. C.) 25 F.(2d) 973.

The Commonwealth was a well-constructed fishing vessel, was equipped according to the accepted standards for such vessels, was in charge of an experienced master, and was fully outfitted with the appliances for extinguishing fires, giving distress signals, and otherwise meeting emergencies that might reasonably be contemplated on the seas.

The owners' duty did not require them to provide a vessel of fireproof construction, or to adopt all the latest appliances, or the best safety devices. The equipment and appliances need only be what is reasonably safe for their purposes. Adams v. Bortz (C. C. A.) 279 F. 521, 525; The Ubbergen (D. C.) 30 F.(2d) 951, 1925 A. M. C. 557, 559. This duty is satisfied if a reasonably staunch and fit vessel is provided, sufficiently equipped for the uses to which the vessel is to be put. Burton v. Greig (D. C.) 265 F. 418; The

Linseed King (D. C.) 24 F.(2d) 967, 970. The Commonwealth cannot be said to fall below the requirements of the standard of construction and equipment generally prevailing among fishing schooners.

It is argued by counsel for the claimants that the vessel did not comply with the Act of June 9, 1910 (36 Stat. 463, U. S. Code, title 46, c. 16, § 516 [46 USCA § 516]), which provides that every motorboat, and also every vessel propelled by machinery other than by steam, more than 65 feet in length, shall carry, ready for immediate use, the means of promptly and effectually extinguishing burning gasoline. The means of promptly and effectually extinguishing burning gasoline were two pyrene fire extinguishers ready for immediate use, both of which were in the engine room, the pump, capable of throwing water, operated by the hoisting engine, and the buckets. The buckets were found to be inadequate. The hoisting pump could not work, because the batteries and boosting coil were in the engine room, and the pyrene fire extinguishers could not be used because they also were in the engine room.

In the light of events, it is very easy to look back and see that the appliances on board could have been used much more effectively for the suppression of a fire in the engine room, if an extra set of batteries and an extra coil had been kept in some other part of the vessel, and if the pyrene extinguishers had not both been placed in the engine room. But any failure to furnish an adequate supply of batteries, or to properly distribute the fire extinguishers, cannot be attributed to the owners. It will be borne in mind that it was the crew, rather than the owners, who bought and paid for the dry batteries used in connection with the hoisting engine. There was no evidence tending to show that the master, or any member of the crew, had made any requisition upon the managing owner for these supplies, or had ever suggested the need of them. The evidence fails to disclose any practice, or custom, among operators of fishing vessels, to carry more than one set of dry batteries. There is nothing to indicate that the master of the Commonwealth did less than was ordinarily done in vessels of the class to which the Commonwealth belonged. Schooner Balsa (D. C.) 1924 A. M. C. 1333. The claimants complain that he did not do more, but failure to adopt precautionary means, not reasonably to be expected on fishing schooners, could hardly be said to be actionable negligence.

The claimants have entirely failed to prove that the fire was due to any defective condition of the machinery or equipment on board the vessel. The engineer was among those of the crew who did not survive, and it will never be known exactly what happened, but it is clear that, if the fire started by the ignition of gasoline vapors, it is a fair inference of fact that the engineer was drawing, or pouring, gasoline while some of the engines were going. There was no necessity for this, and he, under those circumstances, must be held accountable for creating the dangerous situation. In any event, it was a situation for which the owners could not be held responsible. The situation could not be said to be inherently dangerous if the engineer, or the person in charge of the engine room, used a reasonable degree of care.

The burden of showing negligence rests upon the claimants, even in proceedings brought to limit liability. The Rose Standish (D. C.) 26 F.(2d) 480; The 84–H (C. C. A.) 296 F. 427. This burden, I find, has not been sustained. There being no negligence, the question of limitation of liability becomes of no importance. The 84–H, supra.

I might add, however, that the only conclusion above stated which has given me any difficulty is that the failure to provide additional batteries is not negligence, even on the part of the owner, Capt. Watts, the master in charge of the vessel. If it should be held that negligence is here shown, it follows beyond question that such negligence was without the knowledge or privity of the other owners.

The petition for limitation of liability is granted.