### THE WILLIAM A. McKENNEY.

Petition of RICHARDS et al.
No. 159.

District Court, D. Massachusetts.
June 6, 1930.

Blodgett, Jones, Burnham & Bingham, **of** Boston, Mass., for petitioners.

G. Philip Wardner, of Boston, Mass., for Morgan E. Booze, Agnes League, adm'x, and G. Philip Wardner, adm'r.

Simon N. Gazan, of New York City, for Lawrence P. Kellogg.

R. Jackson Cram, of Boston, Mass., for Coleman Silbert, adm'r.

Putnam, Bell, Dutch & Santry, of Boston, Mass., for Susan MacDonald, adm'x.

BREWSTER, District Judge.

This is a petition for limitation of liability, brought by the owners of the steamship William A. McKenney. The vessel and freight have been appraised for the sum of $163,500, which is so near the gross amount claimed by the intervening claimants that the limitation of liability becomes a matter of little importance. The real question presented in the case is whether there is any liability at all, and upon this issue evidence was offered by the petitioners and by the claimants.

The specifications of negligence relied upon were the following:

(1) That the William A. McKenney was not properly navigated;

(2) That the covers of one of the hatches were not sufficiently secured;

(3) That the starboard portable **rail** abreast No. 3 hatch was defective;

(4) That life lines should have been rigged for the protection of the men at work replacing the covers of No. 3 hatch.

I find the following facts:

The William A. McKenney is a freight steamship of 5,855 gross tonnage, engaged in intercoastal trade. She was on a voyage from the Pacific to Atlantic ports via the Panama Canal, loaded with 2,000 tons of magnesite ore in lower No. 2 and No. 3 holds, and about 5,500 tons of lumber below and above deck. The deck cargo was 13 feet high forward and 12 feet high aft and was lashed with chains and turnbuckles. Her last loading port was Long View, Wash., which she left July 27, 1928. The underwriters' surveyor approved the cargo and the seaworthiness of the vessel. She called at San Pedro, Cal., for fuel oil, leaving there August 4, 1928. There is no claim that the vessel was overloaded or

improperly loaded, or that the cargo was improperly stowed and secured; but it is claimed that the fact that, when the vessel left San Pedro August 4 drawing a few inches more than her "loaded draft," a condition was created which has a material bearing upon the first specification of negligence.

The weather was good until August 8, 1928, when the McKenney was about 120 miles southeast of Cape San Lucas, Lower California. Charts and literature were in evidence to show that the vessel was in waters that were traversed by cyclones or hurricanes with more or less frequency. Proctors do not agree in the interpretation of these charts. It is sufficient for the purposes of this case to find that during the month of August a navigator would confront the possibility of storms which would reach cyclonic proportion, and that such storms might overtake him with little, or no, warning. On August 8 the day was quiet, with a moderate southeasterly swell. The wind began to increase until at 8 o'clock p. m. it had a force of 25 nautical miles an hour. The wind had suddenly shifted, and there was then a heavy easterly swell. From this time until midnight the wind continued to increase until it reached hurricane proportions. The barometer had steadily fallen, but not to an extent sufficient to indicate that a cyclone was approaching. No radio warning had been received. Dark clouds had been seen over on the Mexican coast, which indicated the presence there of a severe thunderstorm. About 9 o'clock p. m. the captain discovered that the third mate had headed the vessel up into the wind, and he thereupon ordered the ship to be put back on her course and to proceed at half speed, and there was no further attempt on the part of the captain to bring the vessel against the wind or to alter her course, so that she would be running with the wind, until about 11 o'clock, when he made an attempt to bring the vessel up into the wind, but found that it was impossible to do so because of the severity of the storm. There was some question as to the reasons which actuated the third mate in bringing the vessel about so that it would be running against the wind, but I find the more probable explanation to be that he did so thinking that good seamanship required it, in view of the approaching storm. About 9:30 o'clock p. m., some of the men were sent to take in the awnings and to secure the hatch covers, including the cover to hatch No. 3. This hatch was 18 feet athwartships with a coaming of 29 inches high. It was covered with 10 short and 10 long wooden hatch covers, 2½ inches

thick, resting on iron strongbacks running across the hatch opening. Over this hatch cover was placed 2 heavy canvas tarpaulins which were in good condition. These tarpaulins were drawn across the top of the hatch and down over the side of the coaming until they reached the dogs which held the battens, or iron bars, running around the hatch. These battens were held in place by wooden wedges which were driven in between the battens and the dogs. The tarpaulin was turned under the battens, and these latter were pressed firmly against the tarpaulin by the wooden wedges. If all the wedges had been in, there would have been 34 in all. There were also provided, for the further securing of the hatch, 2 steel hatch bars which were hinged in the center and at each end lashed athwartships by a 9-foot rope lanyard wound back and forth from a ring on the end of the hatch bar to a triangular fastener on the hatch coaming. There was evidence tending to show that this method of securing hatch bars was not the most effective in use and did not literally comply with the requirements of paragraph 17 of Rule 9 of the General Rules and Regulations prescribed by the Board of Supervising Inspectors, pursuant to USCA, title 46, §§ 375 to 384. This paragraph requires the master of a vessel to "assure himself, before proceeding to sea, that all the cargo hatches of his vessel are properly covered and the covers secured. The covers of all exposed hatches shall be made water-tight by the use of pliable gaskets or by heavy canvas tarpaulins, thoroughly covering the hatch cover and firmly secured by iron or steel bars extending from side to side or end to end of the hatchway, which bars shall be securely fastened by toggles or wedges made of hardwood or by the use of efficient screw fastening. Failure by the master of any vessel to observe this regulation shall be sufficient cause for suspension or revocation of his license on a charge of inattention to his duty."

There was a difference of opinion as to whether the iron or steel bars, referred to in the rule, were hatch bars to be extended across the top of the hatches, or whether they referred to the battens, which went around the hatch. As I interpret the rule, it clearly refers to the hatch bars and not to the battens. The hatch bars were not put on the hatch when the steamer left Cape San Lucas. It was not the practice of the captain to require these bars to be put over the hatches so long as the weather was favorable, and it was not until the storm was upon the vessel with more than ordinary force that the crew

was set to work to fasten them. It is disputed that the hatch bars were ever put in place. The mate testified that about 9 o'clock p. m. he went out with a gang of five men, took in the awnings, did some other work on the boat deck, put the hatch bars over No. 3 hatch, and then dismissed his crew; that they finished putting on the bars about 11 o'clock p. m.; and that was the last thing done before the catastrophe, to be referred to later. One of the members of the crew testified that he helped take in the awnings and that while he was with the gang no work was done on the hatch. He could not remember whether the crew did any work after he left it to go on lookout.

The official log mentions the fact that the awnings were taken in, but contains no reference to any work being done on the hatch. The hatch bars were not on the hatch early in the evening of the 8th, and the evidence leaves a lingering doubt whether they were put on at all, but even if they were, I find that due care was not exercised in securing the bars, or in making the battens fast by driving all the wedges in the dogs.

About 1:15 o'clock a. m. on August 9, a heavy sea broke over the deck, shifting the deck load forward and carrying away the foremast, breaking the cargo boom, and, at the same time, the sea washed open No. 3 hatch. At 1:30 o'clock a. m., during a temporary lull, all hands were called to cover this hatch, and while they were at this work a heavy sea, which petitioners' witnesses likened to a "wall of water," came aboard amidships, carrying away 14 of the men who were at work on the hatch. The portable railings, both on the port and starboard side opposite where the men were working, were also carried away by the wave. The vessel suffered other damage, and the water came in over the funnels and put out the fires. There was no life line rigged for the protection of the men working at replacing the covers to hatch No. 3, and the only protection they had against being washed overboard was the portable rail which gave way. This rail was made of two horizontal pipes about 20 feet long. They were fastened to the gunwale by four vertical stanchions which, at the bottom, were squared, tapered, and fitted 4 to 5 inches deep into the sockets. These stanchions were driven into and out of the sockets with a heavy maul. There were no pins to hold the stanchions in their sockets. The top rail at each end had a hook which set into a ring of the permanent rail. Each end of the lower rail had a tongue which fitted into the groove of a lug on the permanent rail. There was a hole through both the tongue and the lug through which a ¼-inch pin was intended to pass. Pins had never been used to hold the tongue in the lug, consequently at the time of the accident there were none in the lug. The first wave had shifted the cargo and had listed the ship to starboard. At the time the vessel was struck by the second and heavier wave or wall of water, she was still in that position, so that the starboard rail was very near the water's edge. It appeared that the life lines were kept in the boatswain's locker aft, and to get them would require a man to go over the lumber making up the deck load aft.

The witnesses agree that the washing away of the covers of No. 3 hatch created a real emergency, requiring immediate action.

■ It is the first contention of the claimants that the captain was negligent in navigating the vessel, and that such negligence contributed to the deaths of the seamen whose lives were lost. On this phase of the case I am led, by the testimony of the captains of other vessels who encountered the same storm, to conclude that the action of the third mate in putting the vessel into the wind about 9 o'clock p. m. was required by good seamanship, and that the captain did not act prudently in ordering the vessel back on to her course, and this is all the more apparent when we consider that the captain himself tried to do this very thing later, after the storm had reached such a stage of violence that it was impossible for him to get the vessel out of the trough of the sea.

■ I do not think, however, that it follows that this failure on the part of the captain to properly handle the vessel can be said to be the proximate cause of the injury. There are too many independent causes which may very well have supervened. It is a matter of speculation whether he would have been able to have controlled this particular vessel, with its particular deck cargo, and to have held it either into the wind or out of the trough of the sea. It is apparent that when the full force of the hurricane struck the vessel she was helpless, and it is not unreasonable to suppose that whatever her course may have been, she would have been more or less helpless at the particular moment when the catastrophe occurred. To attribute the death of any of the men lost to the fact that the vessel was not kept headed into the wind is to carry the sequence of cause and effect beyond its legitimate boundaries.

■■ The second allegation of negligence is that due care was not exercised in fastening

the hatch covers. I have found that there was negligence on the part of those in charge of the vessel in securing these hatch covers, but not wholly on the ground that the hatch bars did not comply with the regulations or that the method of fastening their ends was not the most approved method. The vessel has fulfilled its duty if it has provided a means of fastening the covers which is reasonably safe for that purpose. Adams v. Bortz (C. C. A.) 279 F. 521; Burton v. Greig (D. C.) 265 F. 418; The Commonwealth (D. C.) 31 F.(2d) 142.

■ The negligence consists in not exercising the requisite degree of care in driving the wedges into the dogs holding the battens and in fastening the ends of the hatch bars. The petitioners here insist that if there was negligence in this respect, it was not the proximate cause of the injury; in other words, that between the cause and the disastrous results there was the intervention of an act of God, or vis major, which could not have been anticipated. With this contention I am unable to agree. The negligent failures created a situation which, according to the petitioners' own witnesses, was one of extreme emergency calling for prompt action, and the 20 men who responded to the call were put into an extremely perilous situation, even under circumstances that could reasonably have been anticipated. While it may be that a wave as great as the one which swept down upon the deck of the vessel at about 1:30 o'clock a. m. could not reasonably have been anticipated, yet the storm had assumed such proportions that it was reasonable to suppose that at any moment a heavy sea might break over the vessel with sufficient force to sweep the men before it. This, in my opinion, required that extraordinary precautions be taken to avoid disaster, and no such precautions were taken. In my opinion a causal relation between the negligence and the ensuing loss of life has been established, and the deaths of the men who were swept overboard must be attributed directly to this negligent failure of the responsible officers to exercise that degree of reasonable care which the law requires.

■ The third ground upon which the claimants base their charge of negligence is the failure of the petitioners, or those in charge of the vessel, to provide pins which hold the lower pipe of the portable rail in place. The facts that the rail was designed for their use and that they were not used at the time of the accident and had not been for some time previous, if ever, are conceded, but the petitioners attempt to escape any responsibility because of this failure by urging that if the pins had been in place the rail would have been swept away and that, in any event, if the starboard rail had held, the men would have been swept over it on the crest of the wave. Or, to state the petitioners' claim on this aspect of the case differently, they claim (1) that there was no negligence in not providing the pins, and (2) that if the omission amounted to negligence, that negligence was not the cause of any loss of life.

I think the argument for the petitioners underrates the importance of the pins in the rail. There was nothing to prevent the stanchions being pulled out of their sockets by any movement of the water, which exercised an upward force, except the friction which held them in the sockets. If even a small pin had been placed through the lug and the tongue of the lower horizontal pipe, it would have taken much more of an upward force to lift the stanchions out of the sockets than it did without them. While it is true that one of the lugs was broken off, there was evidence tending to show that it had been broken for some time, and the condition of the permanent rail tends to confirm this evidence.

I am unable to share the belief of petitioners' counsel that, if the pins had been in, the portable rails would have been carried away even by the terrific force of the wall of water which did the damage. While, of course, it is a possibility that they would not have withstood the wave with the pins, it seems to me much more probable that they would have done so. Captains of other vessels which ran into the cyclone gave their depositions, and from their experience some of them thought that even with the rail intact the men would have been carried over it; others thought that they might possibly have been saved. It is a fact that the captain of the William A. McKenney was caught by the wave just as he was running into the lee of the fidley house, and he was borne to the deck and carried under a winch which caught his arm, and to which he was able to cling, thereby saving his life. Another man on the upper deck was hurled down onto the lower deck behind the winch and was saved. Whether any of the men were swept to the rail and were carried away with it is something that will never be known. At the best, it is a matter of conjecture as to what did happen at the time of the catastrophe. With the burden of proof on the claimants to establish that the loss of life was due to defects, or failures, in the equipment of the vessel, it may well be that the absence of pins, stand-

ing alone, would not be sufficient to establish the liability of the petitioners. The claims, so far as brought for the deaths of the seamen, cannot be maintained by simply showing that the vessel was unseaworthy, unless such unseaworthiness was the result of negligence. These claims are brought under US CA, title 46, § 688, which incorporates, by reference, section 51, of title 45 USCA, and the personal representatives of the men who met their death have a right to recover only if the death resulted, in whole or in part, from the negligence of any of the officers, agents, or employees of the carrier, or by reason of any defect or insufficiency due to negligence in its appliances, machinery, boats, and other equipment.

In any event, it is conceivable that the omission may have contributed to the result and, when taken in connection with the other failures or omissions, would have a tendency to support a general charge of negligence on the part of the officers, agents, or employees of the petitioners.

The same may be said of the failure of the officers to run a life line across the deck opposite where the men were working. As already intimated, the men were called to a hazardous undertaking which required the exercise of every reasonable precaution to protect the men engaged in this undertaking. A heavy sea might reasonably have been expected, and the mere fact that there was a temporary lull at the time the men were engaged in re-covering the hatch would not, under the existing circumstances, warrant one in thinking that all dangers had passed. The principal reason assigned for the failure to do this was the extremity of the emergency which had been created by the washing away of the hatch covers. The lines were aft, and it would have involved some risk on the part of one man to have gone back and obtained them, all of which would have delayed the work on the hatch. In the light of subsequent events, it probably would have been better to have taken the time and trouble to do this, but I would not think the failure in itself would be sufficient to render the petitioners liable. The action of the captain in proceeding at once to replace the hatch covers was consistent with due care, according to the weight of the testimony.

I find and rule that the petitioners are liable to respondents in damages to all of the claimants whose claims have been presented, except that of Morgan E. Booze, whose injury cannot be attributed to any of the acts which I have found to constitute negligence on the part of the vessel.

It appeared that the value of the vessel and freight which would measure the petitioners' liability if limited is substantially sufficient to meet the claims that have been presented in these proceedings. For that reason, the question of the limitation of petitioners' liability was not seriously pressed at the trial. There was some evidence tending to show that the owners knew, or were chargeable with knowledge, of the failure to supply pins for the portable rail. There was no evidence that would show that they had any knowledge or privity of the negligent acts and omissions of the officers in charge respecting the No. 3 hatch.

I deny the prayer of the petitioners that they be adjudged not liable for any loss, damage, or injury arising from the occurrences described in the petition; but I grant the prayer that the petitioners' liability be limited to the amount or value of their interest in said steamship William A. McKenney and her pending freight on October 3, 1928.