McGHEE v. UNITED STATES.
District Court, S. D. New York.
March 21, 1947.

Jacquin Frank, of New York City, for libelant.

Hunt, Hill & Betts, of New York City (Geo. Whitefield Betts, Jr., Helen F. Tuohy and S. R. Jackson, all of New York City, of counsel), for respondent.

BRIGHT, District Judge.

The question to be answered on this retrial is, what caused the S. S. Thomas Hooker to be lost as a result of the cracking of her plates on March 5th, 1943.

This suit has been sent back for further findings, because the testimony of Hathaway, the master, and of Nesbit, called as an expert, both witnesses for the respondent, was "baffling and unsatisfactory and it seems to us that justice will be best secured by having them reexamined".

This court had originally found (1) that it had jurisdiction; (2) that the ship was not seaworthy, and defendant was negligent (a) in failing adequately to inspect, (b) because the ship was not adequately and properly ballasted, and (c) because the ballast placed therein was not properly located and distributed; (3) that because of that negligence, plaintiff became ill of tuberculosis and as a result was totally disabled. It was not expressly found that libellant was not guilty of contributory negligence, but he was awarded $20,000 as full damages.

The Circuit Court of Appeals, 2 Cir., 154 F.2d 101, 105, affirmed the findings as to jurisdiction, that libellant's exposure was the cause of his tuberculosis, the award, and the implied finding that libellant had not improperly neglected his safety. It wrote further, "We therefore count out the failure to inspect as actionable faults"; as to the failure to take on enough ballast upon the trip of February 11, "We agree, the judge might have found to be negligent * * * however skeptical we might be"; and as to improper distribution of ballast, the finding of which was based upon the

testimony of Captain Hathaway, "We should hesitate to substitute ourselves as judges of his reliability. It was possible for the judge to find that his opinion was reliable on this issue; he may have been convincing to a degree which the print cannot convey." Its mandate directed a new trial upon two issues—

(1) Were the ship's plates strained on the trip of February 11 because she had insufficient ballast, and were those strains a necessary factor in her cracking on March 5th?

(2) Was the ballast improperly stowed on the trip of February 21, and was that improper stowage a necessary factor to her cracking on March 5th?

It is to be noted that the Circuit Court of Appeals did not decide that the ship was seaworthy or that there was no negligence, otherwise it would have dismissed.

The evidence upon the first and second trials proves these facts.

The Thomas Hooker was a "Liberty" ship, that is, a steel vessel with welded plates, launched July 1942; delivered to the War Shipping Administration in August, and arriving in England on her maiden voyage September 30th, when the master referred to was given his first command. On October 25th she left Glasgow, laden with cargo, bound for Oran among the vessels which aided in the African invasion. She returned, without cargo but with 800 tons of ballast, to Glasgow on December 5th. On December 24th she again left with cargo bound for Bone, Algeria, which she reached on January 5th, 1943. While there she was subjected to repeated enemy attacks and two bombs struck near her, one on the dock, from 25 to 50 feet away, and the other in the water, the evidence shows, from 15 to 100 feet away. She returned to Glasgow, again in ballast, where she arrived on February 1st. On February 11th, she took on 500 tons more of ballast, and left for a trip across the Atlantic.

This, together with the 800 tons which she already had, made 1300 which Hathaway thought enough for a voyage across the Atlantic. She then left to join a convoy but while off the north coast of Ireland, met very heavy weather. The ship was so light that she rolled and bobbed in the sea and she would go down and hit on the waves, her propeller would rise out of the water, the engines would race, and a severe vibration was caused, breaking the telemotor pipe, moving the steering apparatus on the deck three inches and completely disabling ability to steer the ship. It was shown that even in the Clyde, the water was very rough, and the captain stated that the steering trouble had developed even before he cleared the land; that the minute the ship got into the weather, the propeller went out of the water, causing terrific vibration; and that after the telemotor pipe broke, control of the ship was lost and it was at the mercy of the sea for some time— he says for 15 or 20 minutes while changing over to hand steering. However, repairs were made while in the rough sea and Hathaway, believing that he did not have enough ballast, put back to Glasgow for more. There further repairs were made, the fastening hangers on the steam line through the shaft alley were renewed or rewelded. The testimony amply justifies the finding that the reason the trip was abandoned was in order to get more ballast. While in Glasgow, several officers came on board and examined the damage but made no inspection of the ship's plates or any other part except the steering gear. Hathaway asked for 1500 tons more of ballast, but got 800, making 2100 in all, with which the ship again broke ground on February 21st, with her propeller "just submerged", and started for this country on what proved to be her last trip, taking the north Atlantic route.

It is proven without question that at the time of the year when this trip was made, the weather on the north Atlantic route is always rough. What was to be expected was variously described. Hathaway said that during February and March, the weather in the north Atlantic is well known and is a prevailing northwest gale, and that he expected running into storms and that is why he asked for more ballast. Archer, one of the libellant's witnesses, said that the weather is invariably bad. Devlin, another of respondent's witnesses, testified

that he would not be in favor of lightening the ship forward "in the face of winter gales in February", and Geriat, another of respondent's witnesses, stated that the prevailing wind is northwest and you might get all types of seas; and that one of his ships cracked up because of the sea it rose on but that you find those things almost continuously.

The weather proved out as expected; the wind was a west northwest gale, about 7 on the Beaufort scale; the sea rough and the temperatures low. Hathaway said that on March 5th the weather had moderated a bit and that the mate told him that some large sea came along that seemed to raise the ship and drop right down quick at the instant when the crack up happened. Apparently no one else saw this and the mate was not produced as a witness. In any event, at about 5:15 that afternoon, a loud explosion was heard, and upon investigation, the plates were found to be cracked. Hathaway prepared a sketch of the cracks, which was introduced in evidence as Exhibit O. They were not at the joints but through the body of the plates. One ran from the port bulwark down to the ship's side 'tween deck. Another ran thwartship from the same point in the port bulwark to the forward end of No. 3 hatch, and from the after end of that hatch to the starboard bulwark. Another, aft of the last, ran thwartship from the store room along the deck to the starboard bulwark, and a fourth ran from the point at the bulwark about 15 feet aft of the end of the last mentioned crack, down the starboard side to the 'tween deck. The cracks in the sides opened and closed with the ship's pitching and rolling and took in water in quantity.

Plans for ballasting were made by the War Shipping Administration, whose duty it was to furnish the ballast and arrange for its proper distribution, some time after the occurrence in question. These plans, both for summer and winter, were introduced in evidence by the respondent, and it will be interesting to note the comparison between them and the manner in which the Hooker was ballasted on the two trips of February 11th and February 21st.

The figures at the top of the columns refer to the number of the holds; "TD" to 'tweendeck; "DH" to deep hold; "DT" deep tanks; "W" to water, "O" to oil; and "B" to ballast; "Mach" to machinery. The amounts are in tons. (See Exhibit EE)

| Forepeak | 1 | 2 | 3 | Mach | 4 | 5 | Stern |
|---|---|---|---|---|---|---|---|
| Hooker Feb. 11 (total fixed ballast 1300 tons) | | | | | | | |
| TD— | | | | | 200B 56W 760W | | |
| DH—145W | 648W | 400B | 400B | 100 O | 300B | | 155W |
| DT— | 144W | 340W | 234 O | 132W | 236 O | 110 O | |
| Hooker Feb. 21 (total fixed ballast 2100 tons) | | | | | | | |
| TD— | | 50B | 50B | | 100B 56W 760W | 100B | |
| DH—145W | 648W | 400B | 400B | 100 O | 500B | 500B | 155W |
| DT— | 144W | 340W | 234 O | 132W | 236 O | 110 O | |
| WSA Winter Ballast Standard (Total fixed ballast 2000 tons) | | | | | | | |
| TD— | | 185B | 230B | | 185B 56W 760W | | |
| DH—145W | 420W | 350B | 585B | 100 O | 465B | | 155W |
| DT— | 144W | 340W | 234 O | 132W | 236 O | 110 O | |

It is to be noticed that the ballasting of the Hooker did not in many respects comply with the standards set out by the War Shipping Administration. This is relevant to my mind to the question of whether the ballast as distributed by Hathaway placed too much weight fore and aft, resulting in the "hogging" of the consequent cracking amidships—and "breaking of the girder", to which Hathaway had testified on the first trial. It is apparent that the Hooker on both trips had 228 more tons of water in No. 1 hold and 600 more tons in No. 5, than on the standard plan. In the 'tween decks of the three holds near the center of the ship, where, it was testified ballast is put to strengthen the vessel and also to stabilize it in its rolling, there were only 50 tons each in Nos. 2 and 3, against 185 and 230 tons respectively called for by the plan, and 100 tons in No. 4 as against 185 specified. The winter plan of the WSA omitted any ballast in No. 5, and specified a total of 600 tons in the 'tween decks of Nos. 2, 3 and 4; whereas Hathaway had but 300 tons in Nos. 2, 3, 4 and 5 on February 21st, and but 200 on February 11th.

The inadequacy of the ballast on February 11th was amply proven both by the fact that the trip was abandoned so as to get more, and by the action of the ship and what happened when it entered rough water. It was so testified by libellant, and by respondent's witnesses Portunato, Caron and Hathaway on the first trial. Nesbit at that time said it was a contributory factor to the crack up, and Hathaway said otherwise. I then chose to accept Nesbit's testimony, particularly in view of his further testimony, then given in answer to one of my questions, in which he stated that with insufficient ballast, "ships light, which we know during the war a number of them had to leave immediately and drop ballast in them, well, you expect fractures to occur when the vessel runs into heavy weather". I do so now, and believe there is very respectable authority for so doing. Metropolitan Coal Co. v. Howard, 2 Cir., 155 F.2d 780, 782.

On the second trial, libellant's expert Archer definitely stated that in his opinion, the insufficiency of ballast on the first trip, coupled with the racing of the propeller and the rough weather, contributed to the crack up on March 5th. Hathaway and Nesbit both changed their testimony; although Hathaway still admits that he turned back to get more ballast. That the insufficiency of the ballast on the first trip could have been a contributing factor to the crack up is also practically admitted on the second trial by Nesbit, who testified that he hazarded a guess that the crack up was caused by the unusual sea that was encountered on the evening of March 5th after the storm abated, but that was not a definite conclusion; and that other contributing causes would be everything the vessel had gone through from the time the keel was laid, including, among others, light ballast and near bombings; that excessive vibration would strain the plates and would be liable to affect them. I see no reason, therefore, to change my previous conclusion.

As previously noted, on the February 21st trip, 600 tons of ballast was put in No. 5 hold. There had been none there on the February 11th trip, and neither the spring nor the winter WSA plan called for any. The other differences between the standard plan and the Hooker ballasting have been commented upon. Hathaway had testified on the first trial that when he reported "insufficient ballast" as the cause of the crack up, he meant he did not think there was enough in the center of the ship and too much weight on the ends of the vessel, that the vessel is a girder and when she gets on top of a wave, if she has too much weight in the ends, a terrific strain is put on the center, and eventually you can break the girder. On the second trial, he testified that in his opinion, the ship had sufficient ballast and was properly trimmed and that he was then not of the opinion that the Hooker cracked because of insufficient or improperly placed ballast; that he then had no opinion as to how it occurred. But, he said that he came to his original conclusion when he landed after the crack up at Agencia; that was the only reason apparent to him then; that when he came back from the February 11th trip, he asked for more ballast than he got, and if he had had his way, he would have increased the amount in Nos. 2 and 3, which he thought

might have prevented the breaking of the girder. He said he had changed his opinion because of the greater number of Liberty ships that had broken up since the Hooker did and the fact that they altered the construction of the ship; forgetting, of course, that he probably had that knowledge when he previously testified as the Hooker had cracked on March 5, 1943, and he did not give his original testimony until March 14, 1945.

I think his original testimony was the truth. Metropolitan Coal Co. v. Howard, supra. And that testimony is now corroborated by other proof. Archer, after examining Exhibit O showing the location and character of the cracks, testified that the ship was "hogged", too heavy at the ends and up at the center and that the crack up on March 5th was because of too much weight in Nos. 1 and 5, in other words, due to improper loading. In this he was in part corroborated by the testimony of respondent's witness Stover, who stated that there was more danger from hogging under the ballast distribution existing on the 21st than on the 11th, although he did say that it was not too dangerous; and by the definite testimony of the respondent's witness Vasta, who testified after looking at Exhibit O, "That is the type of crack which means that the middle portion of the ship, which is the region of the high stress, will experience under severe hogging conditions".

It is true, of course, that others of respondent's witnesses testified, almost to a man, that the Hooker on February 11th and February 21st was sufficiently ballasted and in good trim, and that the distribution of the ballast did not contribute to the crack up. But when pressed for their explanation as to what did cause it, almost to a man they professed not to know and had no opinion.

There is other testimony which has some bearing upon the question. Many of the respondent's witnesses discussed the crack up in other Liberty ships before and after the accident to the Hooker. In this connection, however, it must not be overlooked that there were two or three other Liberty ships in the same convoy at the time of the Hooker crack up, and apparently nothing happened to them. Aside from this, it is shown that about 2700 Liberty ships had been built and that six had been lost by crack ups. A list of those which had cracked was introduced in evidence and it appears that there had been 188 ships which cracked, all of which, except the six, had been saved by repair. Eighteen of these had cracked before the Hooker was lost. Study had been made of the cracks, from which it appeared apparently that the weakness was at hatch corners, and as the ships came in, the hatch corners were reenforced, a doubler plate was riveted to the hull running from No. 1 hold to the middle of No. 5, by riveting doubler plates on the sheerstrake on the inside and outside of the hull, and by installing doubler plates the whole length of the main deck between the two hatches forward and the two aft. These were put on to give additional strength and have tended to reduce the number of crack ups. Nesbit testified that the original planned construction proved to be insufficient to withstand the perils of the sea, and further said, "They were expendable, that is part of our Navy in fighting the war. If a vessel made one or two trips, she was considered good, she paid for herself, all well and good, and delivered the goods". One wonders from this testimony whether a man's life or health under such circumstances can be neglected and compensated for by the statement that the stress of circumstances justified the chance. I am not inclined to adopt a suggestion that a life or health is "expendable" even if the ships are.

The only witnesses, other than Archer, who gave their opinions as to what caused the crack up and the effect of the voyage of February 11th upon it, were those called by respondent. Nesbit hazarded a guess that the crack up was caused by the unusual sea. This was contradicted by respondent's witness Stover, who said that a wave to break one of these ships would have to be higher than $\frac{1}{20}$th of the length of the ship, in other words, 22 feet high, of which there certainly was no proof. Vasta said that an unusual sea striking the vessel on the starboard would have no effect of cracking it, and if the ship rose high up on the sea and came down suddenly on a small one, he did not believe that would have any

effect with the cracking. Stover did say that he was sure that the crack up was not caused by improper ballasting or poor design, but he also said that he did not know what the reason was and had not arrived at any conclusion. Jones thought it was caused by pent up stress in the welded plates, but Vasta said that such stresses were not believed to be of primary importance as a factor contributing to the fracture of ships. The net result of the testimony given by respondent was of such a contradictory character that I can accord it little weight. That, coupled with the fact that its two important witnesses on the first trial have now attempted to recant their former testimony, confirms me in the conclusion at which I have arrived.

Respondent asserts, however, that libellant has elected to sue under the Jones Act, 46 U.S.C.A. § 688, and has failed to sustain the burden of proof imposed upon him, because his pleading is solely of negligence; that having so elected he cannot recover under the maritime law for unseaworthiness of the vessel.

It may be true that where the only allegation of fault is negligence, the presumption is that the claim is made under the Jones Act. Oliver v. Calmar S. S. Co., D.C., 33 F.Supp. 356; Burkholder v. United States, D.C., 56 F.Supp. 106, 109. And it can be assumed that libellant must elect between such a claim and one under the maritime law, Pacific Steamship Co. v. Peterson, 278 U.S. 130, 138, 49 S.Ct. 75, 73 L.Ed. 220; Burkholder v. United States, D.C., 60 F.Supp. 700, 701, and an election is made by invoking one or the other remedy. Kuhlman v. W. & A. Fletcher Co., 3 Cir., 20 F.2d 465, 467.

But these statements of the law do not militate against libellant's recovery here. He was required in stating his claim to set out all acts and omissions, whether of negligence or unseaworthiness, by reason of which he alleged he was injured. There was no requirement that these several matters be separately stated in more than one claim. Baltimore Steamship Co. v. Phillips, 274 U.S. 316, 321, 47 S.Ct. 600, 71 L.Ed. 1069; Renew v. United States, D.C., 1 F.Supp. 256, 260.

And unseaworthiness and negligence are not inconsistent; oftentimes they are dependent upon the same facts. In Pacific Steamship Co. v. Peterson, supra, it was written at page 138 of 278 U.S., at page 77 of 49 S.Ct., 73 L.Ed. 220, "Unseaworthiness, as is well understood, embraces certain species of negligence; while the statute (the Jones Act) includes several additional species not embraced in that term." Other cases illustrate the point. In The William A. McKenney, D.C., 41 F.2d 754, 759, it was said that a Jones Act case could not be maintained simply by showing unseaworthiness, "unless such unseaworthiness was the result of negligence." In Mahnich v. Southern S. S. Co., 321 U.S. 96, 100, 64 S.Ct. 455, 458, 88 L.Ed. 561, where a staging, upon which a seaman was working, fell because a defective rope broke, and where the vessel owner was held liable for unseaworthiness, Chief Justice Stone wrote: "If the owner is liable for furnishing an unseaworthy appliance, even when he is not negligent, a fortiori his obligation is unaffected by the fact that the negligence of the officers of the vessel contributed to its unseaworthiness." Under that case unseaworthiness and failure to furnish a safe place to work, both nondelegable, would seem to go hand in hand. See also Carlisle Packing Co. v. Sandanger, 259 U.S. 255–259, 42 S.Ct. 475, 66 L.Ed. 927; Patton-Tully Trans. Co. v. Turner, 6 Cir., 269 F. 334, 339; Hoof v. Pacific American Fisheries, D.C., 284 F. 174, 177, affirmed 9 Cir., 291 F. 306, certiorari denied 263 U.S. 712, 44 S.Ct. 38, 68 L.Ed. 520; Krey v. United States, 2 Cir., 123 F.2d 1008; Lopoczyk v. Chester A. Poling, Inc., 2 Cir., 152 F.2d 457, 458; and The Magdapur, D.C., 3 F.Supp. 971, 972.

I think libellant sustained the burden of proving both unseaworthiness and negligence.

Unseaworthiness was proven by the facts showing that because of lack of ballast on the February 11th voyage the ship's hull was weakened. In addition to what is mentioned above, it is to be observed that on that voyage the Hooker carried 700 tons less than called for by the standard plan. And on the last voyage, the ballast was so distributed as to make the vessel particular-

ly vulnerable to the bad weather and seas which it was known she would encounter. Seaworthiness would require proper stowage (Metropolitan Coal Co. v. Howard, 2 Cir., 155 F.2d 780, 783; The Medea, 9 Cir., 179 F. 781, 792, 794), as well as proper ballasting. Sumner v. Caswell, D.C., 20 F. 249, 251. That the accident may have been caused in part by the wave, would not excuse where it was obvious that the weather and sea were not unusual for that time of the year, the ship was required to be constructed to withstand such seas, and apparently no other ship in the vicinity was injured. Waterman Steamship Corp. v. United States Smelting, Refining & Mining Co., 5 Cir., 155 F.2d 687, 693; Hockley v. Eastern Transportation Co., D.C., 10 F. Supp. 908, 911.

■ There was for the same reasons, and others, ample proof of negligence. Under the rule of res ipsa loquitur, when a thing which causes injury, without fault of the injured person, is shown to be under the exclusive control of the respondent, and the injury is such as in the ordinary course of things does not occur if the one having such control uses proper care, it affords reasonable evidence, in the absence of an explanation, that the injury arose from the respondent's want of care. San Juan Light & Transit Co. v. Requena, 224 U.S. 89, 98, 32 S.Ct. 399, 56 L.Ed. 680; Jesionowski v. Boston & Maine R. R., 1947, 329 U.S. 452, 67 S.Ct. 401; The Columbia, D.C., 25 F.2d 516, affirmed 2 Cir., 25 F.2d at page 518; The Rambler, 2 Cir., 290 F. 791; Radisich v. Franco-Italian Packing Co., 1946, 68 Cal. App.2d 825, 158 P.2d 435; Central R. Co. v. Peluso, 2 Cir., 286 F. 661, 664, certiorari denied 261 U.S. 613, 43 S.Ct. 359, 67 L.Ed. 827; and Leathem Smith-Putnam Nav. Co., 7 Cir., 79 F.2d 280, 284, certiorari denied 296 U.S. 653, 56 S.Ct. 370, 80 L.Ed. 465.

The respondent has not shown any explanation for the cracking of the ship. Most of its witnesses, two of whom gave an explanation for it upon the first trial, now say they do not know what caused it. I refer particularly to the testimony of Hathaway, Nesbit, Devlin, Stover and Vasta.

■ Respondent suggests that this rule does not apply where there is a specific pleading and proof of negligence. The cases which it cites do not, in my opinion, apply here since the enactment of Rule 8, Federal Rules of Civil Procedure, 28 U.S. C.A. following section 723c.

■ Aside from the rule of res ipsa loquitur, libellant, in my judgment, has sustained his burden. The facts are set out above, and from those testified to by and in behalf of libellant, as well as those stated by respondent's witnesses, I think the two questions posed by the Circuit Court of Appeals should be answered in the affirmative.

■ In view of this decision I think libellant's motion for an order directing payment of maintenance to him, pending judgment, should be denied. The original award was intended to fully compensate libellant for his injury as well as for maintenance and cure. Aside from that, I doubt very much my right to make the order prayed for.

Libellant's counsel may serve proposed findings and conclusions upon respondent's attorneys within ten days, and the latter may submit whatever objections he may have to the same. The court will then make the findings and conclusions which are to be filed.