[Civ. No. 14446. Second Dist., Div. Three. Apr. 24, 1945.]

ANKA RADISICH, as Administratrix, etc., Respondent, v. FRANCO-ITALIAN PACKING COMPANY (a Corporation), Appellant.

828

Overton, Lyman & Plumb and L. K. Vermille for Appellant.

David A. Fall for Respondent.

DESMOND, P. J.—The defendant, Franco-Italian Packing Company, hereinafter referred to as the company, appeals from a judgment entered upon a jury verdict awarding the plaintiff, the surviving widow of Philip Radisich, the sum of $8,000 damages for his death, which occurred when he was fifty-three years old. The action was brought under the provisions of the Jones Act (46 U.S.C.A. § 688) against the company, as owner *pro hac vice* of the purse seiner, "Chinook," and Luca Joncich, the master of the vessel. As to the latter defendant, it was dismissed upon motion of plaintiff just prior to the submission of the case to the jury.

Appellant claims that the judgment should be reversed for various reasons: 1. That there was no employer-employee relationship existing between the company and Philip Radisich; 2. That not only was there no proof of negligence on the part of the company but "the accident was caused solely by the fault and negligence of deceased, who was an experienced fisherman, getting too close to the winch"; 3. That the court erred in refusing to allow the introduction of testimony relative to an agreement between the boat owner, Nick Mardesich, and the company as to control of the boat upon which Radisich was killed; 4. That the court erred in giving instructions to the jury on "res ipsa loquitur," in giving conflicting and contradictory instructions on inference of negligence and, also, in giving erroneous instructions to the jury concerning the award of damages. The merit or lack of merit of these contentions must be determined by the record, including a study of pertinent exhibits.

Nick Mardesich of Bellingham, Washington, hereinafter called the owner, was the registered owner of the "Chinook," and in May and June of 1940 had considerable correspondence with the company, through his attorney, concerning a proposal that the vessel be employed in fishing off the coast of Southern California from November, 1940, to April, 1941. As the result of these negotiations the company obtained the "Chinook" in the following November in the early part of the sardine fishing season. On November 19, 1940, Mr. Norton, assistant secretary for the company, wrote the attorney for the owner at Bellingham, Washington, the following letter:

"Dear Mr. Greene:—

"This will introduce Mr. Louis Joncich, who we are sending to bring down the good ship 'Chinook.'

"Will you please see that Mr. Joncich is assisted in every possible way in obtaining necessary supplies, etc., for his trip here. Speed is important as sardines are running plentifully now, and every day means a lot of money.

"Draw on us thru California Bank, Terminal Island for ballast which we wired about and groceries, etc. Fuel will be furnished by Union Oil Company."

Shortly after this letter was presented, Mr. Joncich and the owner went together to the customs office and entered Joncich's name as captain of the vessel. Joncich then engaged a crew of nine additional men. Among these was the deceased.

The "Chinook" was of the smaller type fishing vessel, being 56 feet in length and 15 feet in breadth with a draft of 7 feet. Between the pilot house, located near the bow of the vessel, and one of the vessel's hatches, was a winch, with a double niggerhead, one spool of which, called the "forward" niggerhead, faced the pilot house, and the other, called the "aft" niggerhead, faced the center of the hatch opening. The distance between the hatch and the aft niggerhead was approximately 6 or 7 inches. The accident occurred on February 25, 1941, about twenty minutes after 12 noon, while the "Chinook" was on the lee side of Santa Barbara Island, and the crew was engaged in washing its nets. The deceased, following orders of the master, was working back and forth on the starboard side of the vessel from the fore corner of the hatch to a point close to the aft niggerhead. Jerry Rodich, the engineer of the vessel, worked near the aft corner of the same hatch, also on the starboard side. The cook of the vessel, Earl O'Neil, was stationed at the forward niggerhead and worked just "abow" the deceased. The master was washing the net with a hose, standing 8 or 10 feet "astern" of the hatch, between it and a turntable. Part of the net was in the hold of the vessel, part of it on the turntable, and part of it in the air, held by a line that went to the forward niggerhead. The cook, O'Neil, "operated both the winch and took care of taking the line off of the niggerhead," during the raising of the net, and he testified that he "wrapped the rope about three times around the niggerhead and pulled on the loose

end of it, and the net would go up to the top of the boom and as they washed it down, I let it slip down a few feet at a time.'' The deceased and Rodich were putting a sling around the net [i. e. a rope encircling the net so that it could be lifted from the hold] and fastening to the sling a hook which was attached to the line going directly to the forward niggerhead. Rodich had just handed the sling to Radisich when the latter's apron caught in the aft niggerhead and he ''screamed frantically . . . 'Stop the winch'.'' Twice he uttered this cry. It was stipulated between counsel that if Rodich were asked the question whether he talked to the deceased shortly before the accident, he would testify that within a few minutes before it occurred, he said to the deceased, ''Better stay away from the winch,'' and the deceased replied, ''I know what I am doing. I am an experienced fisherman.'' O'Neil, the cook, upon hearing Radisich's cry, grabbed the handle of the winch's deck control lever, which was located on the starboard side of the winch, close to the forward niggerhead, and tried with all his strength to stop the winch, even going down on his knees, but could not pull the handle of the lever loose, although Rodich pushed on it at the same time. To operate the deck control lever it was necessary ordinarily merely ''to push it left or right,'' but on this occasion it would not operate by hand or until Rodich, the engineer, stopped the engine. Meantime, the deceased was twisted around and pulled underneath the niggerhead, between the deck and the niggerhead and the hatch coaming, his body being thrown at least twice to the deck of the boat, killing him almost instantly.

 Appellant, in support of its contention that the company was not the owner *pro hac vice* of the ''Chinook'' and, therefore, not liable for the death of Radisich, argues that the correspondence between the company and the owner did not indicate a charter of demise under which the entire ship was surrendered to defendant, but merely a fishing contract. Although in the instant case there was no formal document, called a charter party and signed by the parties, the jury nevertheless could determine whether the vessel was actually ''chartered'' by considering the correspondence between the parties, together with the company's subsequent proprietary action over the vessel, its hiring of, and exclusive control over the master and the crew, and its bearing the loss on this unprofitable venture. That all these circumstances evinced an

intent to transfer complete control and possession of the vessel to the company during the sardine season amply justified the jury's implied finding that the company was the owner *pro hac vice* of the vessel at the time of the accident.

The correspondence discloses that in the early part of 1940, the owner was in financial difficulties with his creditors, certain of whom had libeled the "Chinook" in the State of Washington and threatened a sale. However, after an exchange of letters and telegrams between the owner and various creditors, including the company, a sale was averted and the owner's debts refinanced, the company agreeing to extend for three years a mortgage which it held on the vessel, upon the promise of the owner and the other creditors that the vessel would fish for it in California during the sardine season commencing in November and ending in April of the following year. The company was to extend the "usual credit for outfitting and insurance" and was to return the boat to Bellingham, Washington, "in April [of] each year" during the mortgage extension. As payment for the use of the boat it was agreed between all parties that the boat would receive two shares of the season's catch, to be paid not to the owner but to a trustee for the creditors. The company was to provide the sardine seine. We have already quoted the letter presented by Joncich when he went to Bellingham to take charge as skipper or master and to bring the vessel to California, all costs and expenses being advanced by the company. Joncich, acting under instructions from the company, chose his crew, some being hired in the North and some in California. Since ballast was needed for the vessel on its trip down the coast, the company ordered for its own use and paid for some 20,000 feet of lumber as a deck load, which thus served a double purpose, "as ballast" for the vessel and as cargo for the company. When the "Chinook" arrived in San Pedro she was placed in dry dock for damage caused to the propeller on the way down, for which damage the insurance carrier was notified, and presumably paid the bill. Also, while the vessel was in dry dock, the company, upon its own initiative and order, installed in the vessel a large water pump owned by it and, in addition, ordered certain changes made to the hatches, changing it from a three-hatch to a two-hatch vessel, making one of the hatches smaller "because the niggerhead was in the way," and raising its coaming "to prevent the sea from washing down into the hold." There is evidence that

the bill for these alterations, dated December 21, 1940, was sent to the ''Chinook'' and owners, c/o the company, covering work done for the period ''12/6/40 to 12/21/40,'' and the owner testified that he ''did not pay any bills after the new captain took over.'' The jury trying this case three years after the alterations were made would have been warranted in concluding that the bill was paid by the company since the changes were made at its request and upon its order, even though the office manager of the company could not say whether or not the bill was ever paid.

█ Joncich gave positive testimony to the effect that he had been hired by the president of the company to skipper the vessel and could be fired by him alone; that he had been instructed by him to hire the crew, had received and had been advanced by the company all expenses in connection with bringing the vessel from Washington to California, and had been further instructed to bring to the company cannery all the fish which might be caught. Joncich and the owner both denied that the latter had hired the former or had any control over him. In view of the somewhat evasive testimony offered by the company's officers to contradict Joncich's statements, the question of whether he was in the employ of the owner or of the company, as owner *pro hac vice,* was properly left to the determination of the jury. (*The Norland* (*Loe* v. *Goldstein*) (1939), 101 F.2d 967, 971.) The record is devoid of any evidence indicating that the owner retained any command, possession or control over the vessel, its crew, or its fishing venture after it had been turned over to the company as owner *pro hac vice,* his only interest in the venture being to reduce the indebtedness owed his creditors by receipt of two shares from the season's catch as payment for the use of the vessel.

In accordance with the usual custom in the fishing industry, the catch was to be divided into shares. After operating expense, such as the cost of fuel, ice and moorage, was deducted, the balance of money derived from the sale of fish to the company would be distributed according to the shares: the boat or owner to receive its two shares; the company two for its seine; and each member of the crew one, with an additional one-half share to the master as a bonus, all of these shares to the fishermen being in the nature of wages. (See *United States* v. *Laflin* (1928), 24 F.2d 683, 685.) The evi-

dence further revealed that in arriving at the amount due on shares the repair bill was not deducted as an expense and the loss sustained on the venture was borne solely by the company, the owner not being charged with any portion of it.

■ Appellant's contention that the court erred in sustaining objections to conversations bearing upon the control of the boat and its officers relates to two occasions when the owner came to California, one of which allegedly took place "in the summer of 1940" and the other in December, 1940, after the negotiations for the delivery of the "Chinook" had been completed and an actual transfer of the boat had been made. We find no error on the part of the court in excluding this testimony, since the correspondence discloses that these two matters, allegedly covered in the conversations to which objection was sustained, i. e., the disapproval by the owner of the contemplated hiring by the company of a certain skipper in whom he had no confidence and the owner's alleged insistence that all the fish be delivered to the company and not distributed to several canneries on a quota basis, had been considered and agreed upon by the parties prior to the actual transfer of control of the vessel to the company, as owner *pro hac vice*. The correspondence reveals that the company had accepted the owner's suggestion concerning a skipper; further, that it was the company that insisted that all the fish be delivered to its cannery because it agreed at the very start of negotiations to extend its mortgage only if the "Chinook" would *"fish for us."* Under these conditions there was nothing to indicate that the company was not the owner *pro hac vice* at the time of the accident, and subject, therefore, to the same burden of liability for torts that attaches to an owner operating his own vessel.

■ Appellant urges as a ground for reversal that there was no proof of negligence on the part of defendant company and that the doctrine of res ipsa loquitur was not applicable in this case. We do not accept that view. In *LeJeune* v. *General Petroleum Corp.* (1932), 128 Cal.App. 404 [18 P.2d 429], is found a discussion of the applicability of the doctrine of res ipsa loquitur in actions brought under the Jones Act. This case also cites with approval the case of *Michener* v. *Hutton*, 203 Cal. 604, and at page 412 [265 P. 238, 59 A.L.R. 480], quotes from it as follows: " 'The courts of this state have long since adopted the rule as expressed in 1 Shearman & Redfield on Negligence, 6th ed., p. 132, viz.: "Where the

thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of proper care.'' [Cases cited.] Of course to justify the application of this doctrine in any case the circumstances of the accident must be such as, unexplained, afford reasonable evidence of want of care in a respect for which the defendant is liable in the particular action. . . . One who seeks to recover damages for injuries alleged to have been incurred by reason of another's negligence must establish by a preponderance of the evidence that the latter's negligence has occasioned him loss. *However, where the facts are such as to give rise to an inference of negligence from the inherent nature and character of the act causing the injury,* or, in other words, to give application to the principle of *res ipsa loquitur,* the burden of proceeding is shifted to the defendant, and if he would escape an adverse finding he must adduce evidence to meet the plaintiff's *prima facie* case.' '' (Italics added.) In the case at bar, there was evidence from which the jury was warranted in concluding that the deck control lever was defective because it would not operate at the time of the accident and was, therefore, unsafe; further, that its failure to work immediately after decedent's cry of ''Stop the winch,'' and the delay which ensued due to the necessity of stopping the engine below deck, constituted the proximate cause of the injury and death. Three witnesses, who testified concerning the events which occurred just prior to decedent's death, were O'Neil, the cook, Rodich, the engineer, and Joncich, the master. Since the jury returned a verdict in favor of the plaintiff, it must be assumed that they believed the following testimony of O'Neil, as contained in his deposition: ''Q. What is the first indication you had there was anything wrong? A. A man hollered 'Stop the winch.' Q. What did you see? . . . A. I seen him stoop over and knock his apron loose. Q. Now, when you heard this 'Stop the winch,' was it just a conversational tone of voice? A. No. . . . He screamed frantically . . . 'Stop the winch.' Q. What did you do? A. I stepped one step, grabbed the handle and tried to stop it, and dropped my net. Q. Were you able to stop the winch? A. No, I couldn't pull the handle loose. Q. What did other members of the crew do? A. Every-

body stood spellbound but Jerry, the engineer. He was on the right side on the stern so he could see the man tangled up in the winch, and he wasn't very many steps from the handle where I was. He was piling the lead line, which is close to the handle, and he stepped over there and pushed on the handle while I was pulling it, and couldn't get it off, so he ran down to the engine room and stopped the engine. Q. What degree of force did you use to try to throw the winch out of gear? . . . A. All the strength I had, trying. I was down on my knees. Q. How much time elapsed, if any, from the time that you heard the cry 'Stop the winch' until you tried to throw the winch out of gear? A. Oh, probably not more than a second or two, at the outside. Q. Did you move at once, or was there a delay there at all? A. Not a second. . . . Q. Now, where was Mr. Radisich standing at the time that you heard him cry 'Stop the winch'? A. He was at all times, we were washing the nets, standing on the starboard side, between the corner and the niggerhead. . . . The corner of the hatch and the niggerhead. . . . Q. Was he [deceased] at that point in compliance with some direction of the skipper, if you know? Did you and, including Mr. Radisich, take your places and do your jobs there pursuant to the order of the skipper? A. Absolutely. . . . Q. Was the winch stopped until the engineer went below and shut off the engine? . . . A. Not until the engine was shut off. . . . Q. How did Mr. Radisich meet his death? A. Catching his apron on the niggerhead, twisting him around, and pulling him underneath, between the deck and the niggerhead and the hatch combing [sic]. Q. Did you hear Mr. Radisich's body strike the deck? A. Yes. Q. Was that after or before the time that you endeavored to shut off the winch? A. While I was trying to shut off the winch.''

It is evident from the foregoing testimony that the winch was under the control of the employees of the company. One of the purposes of the deck control lever of the winch was to stop the operation of the winch on deck and when it was in a safe condition and properly managed it so operated; the fact that it did not operate on this occasion gave rise to an inference that the winch was not in a safe condition, which, in the absence of an explanation by the company, ''afforded reasonable evidence . . . that the accident arose from want of proper care'' on the part of the company. Several witnesses on behalf of the company stated that there had been no trouble with the winch prior to decedent's death, but no

explanation concerning the cause of the failure of the deck control lever to operate was offered by the company. Whether the testimony of these witnesses was sufficient to overcome plaintiff's prima facie case was a question for the jury. (*LeJeune* v. *General Petroleum Corp., supra,* at p. 415.) The court stated in the case of *Soto* v. *Spring Valley Water Co.* (1918), 39 Cal.App. 187, p. 190 [178 P. 305]: "No reason-able inference seems possible, except that this apparatus, had it been properly operated, would have been safe, and that its improper operation was due to the negligence of somebody or to some defect in the machinery, undisclosed to and undiscoverable by the deceased, and known, if known to anybody, to the defendant's employees. . . . It may be added that in this case the real moving cause of this accident is not shown. It is true that it appears that the scraper, for some reason, was dragged too far by the cable, thus wrecking the timbers, but this is only the result of some other cause which must have been the underlying reason for the accident. This underlying cause is not proven, but it does seem to us that nothing could be clearer than that somebody's carelessness must have caused it.'' ▮ Whether or not the deceased in the instant case was guilty of contributory negligence, or exercised such care as a prudent man in his situation would ordinarily have exercised for the protection of his life, was also a question for the jury under the circumstances and evidence before it. (*Davies* v. *Oceanic Steamship Co.* (1891), 89 Cal. 280, 285 [26 P. 827].) ▮ Even though the jury might have considered that the deceased had been guilty of contributory negligence in getting too close to the winch, that would not have been a bar to a recovery under the Jones Act for, as the jury was instructed, ". . . the damages shall be diminished . . . in proportion to the amount of negligence attributable to such employee.'' (45 U.S.C.A. § 53.)

▮ Appellant argues further that the court erred in instructing the jury on the doctrine of res ipsa loquitur in this case because (a) the complaint did not allege general acts of negligence but alleged specifically the negligence complained of, (b) the opening statement of counsel indicated that it was not the intention of plaintiff to rely upon the doctrine, and (c) the evidence fully explained how the accident occurred and the proximate cause thereof. In support of its argument that the complaint did not allege general acts of

negligence, our attention is called specifically to Paragraphs X, XI and XII of the complaint. The complaint contained but one cause of action. Paragraph X, which merely set out the various duties owed to plaintiff by defendant in providing a safe and seaworthy vessel, alleges, "That it was the duty of the defendant Franco-Italian Packing Company, a corporation, to·provide Philip Radisich, deceased, with a safe and seaworthy vessel and appliances, and to keep the same in a safe condition; to furnish said Philip Radisich, deceased, with a safe place to work; to furnish him with reasonably safe and seaworthy tools and appliances and keep the same in a safe condition; to furnish said decedent with a sufficient number of competent co-employees and superior officers; to promulgate and enforce proper and safe rules for the safe conduct of said work and to ·warn said decedent of the dangers arising and to be encountered therein." Paragraph XI alleged that by reason of the negligent failure of defendant, and of its agents, employees and servants, to perform the foregoing duties, "while the deceased was engaged in his duties on board said vessel, while it was upon the high seas of the Pacific Ocean on the lee side of Santa Barbara Island, off the coast of the State of California, and while he was assisting in the cleaning of a net thereupon, his apron was caught ~~in a rope~~ and drawn into the drum of the ship's winch throwing said Philip Radisich, deceased, against the deck of said vessel five or six times, inflicting injuries upon him which proximately caused his death within a few minutes thereafter." The italicized and crossed-out portion just quoted was ordered stricken upon motion of plaintiff during the progress of the trial. The foregoing paragraph is but a general allegation of negligence on the part of the defendant, for it does not attempt to set out or explain in any manner the "underlying cause" of the accident or the specific manner in which it occurred. (*Soto* v. *Spring Valley Water Co., supra,* at p. 190; *Vertson* v. *City of Los Angeles* (1931), 116 Cal. App. 114, 123-4 [2 P.2d 411]; *Armstrong* v. *Wallace* (1935), 8 Cal.App.2d 429, 435 [47 P.2d 740]; *Bourguignon* v. *Peninsular Ry. Co.* (1919), 40 Cal.App. 689, 691 [181 P. 669]; *Atkinson* v. *United Railroads of S. F.* (1925), 71 Cal.App. 82, 88-95 [234 P. 863]; *Lippert* v. *Pacific Sugar Corporation* (1917), 33 Cal.App. 198, 208 [164 P. 810]; *Seney* v. *Pickwick Stages* (1927), 82 Cal.App. 226, 229 [255 P. 279].) ■ Paragraph XII, however, goes further and alleges negligence spe-

cifically, to wit, that the injuries which caused the death of decedent were directly caused by the negligence of defendant, its agents, servants and employees, in that they failed and neglected (1) to supply decedent with a safe place to work, (2) failed to supply deceased with a sufficient number of co-employees and superior officers, and that the employees and officers supplied were negligent, (3) failed to supply the vessel with safe equipment but "did supply a frayed and worn-out rope for a fall from the ship's winch," maintained a "defective and unguarded winch, all of which rendered the place where deceased was ordered to work unsafe," (4) failed to properly superintend and supervise the work going on at the time decedent was injured, and (5) failed to promulgate and enforce safe rules "for the safe conduct of said work and to warn deceased of the impending dangers."

Where a plaintiff pleads negligence both generally and specifically the doctrine of res ipsa loquitur may be relied upon. (*Vertson* v. *City of Los Angeles, supra,* 116 Cal.App. 114, 123; *Ellis* v. *Jewett,* 18 Cal.App.2d 629, 635 [64 P.2d 432]; *Mudrick* v. *Market Street Ry. Co.,* 11 Cal.2d 724, 729 [81 P.2d 950, 118 A.L.R. 533]; *McComas* v. *Al G. Barnes Shows Co.* (1932), 215 Cal. 685, 697 [12 P.2d 630]; *Leet* v. *Union Pac. R. R. Co.,* 25 Cal.2d 605, 618 [155 P.2d 42], and additional cases cited therein.)

We find no basis for appellant's contention that plaintiff's counsel in his opening statement indicated that plaintiff would not rely upon the doctrine. He merely enumerated the various events and actions of the fishermen aboard the vessel and the events just immediately preceding and following the death of the decedent; he described the action of the cook and the engineer and the turning off of the engine before the winch could be stopped. No attempt was made by him at that time, or at any time during the trial, by evidence or otherwise, to explain why, or in what particulars, the deck control lever did not operate or what particular negligence defendant was guilty of in maintaining a deck control lever which would not operate promptly or properly.

Nor can we agree with appellant's contention that the evidence fully explained how the accident occurred. The evidence, as also the attorney's opening statement, went no further than to explain to the jury the events leading up to the accident, the failure of the deck control lever to stop the

winch, and the shutting off the engine in order to stop the winch. The evidence adduced by plaintiff was in proof of her general allegation of negligence; no attempt was made by her to prove any of the specific allegations of negligence set forth in her complaint, nor was any attempt made in this case to show the "underlying cause" of the accident, i. e., why the deck control lever failed to operate after the call "Stop the winch." was made. (See *Soto* v. *Spring Valley Water Co.*, *supra*, at page 190.)

Appellant contends that the court erred in giving the following instructions, arguing that they are "wholly inconsistent and clearly contradictory":

(a) "From the happening of the accident involved in this case, as established by the evidence, there arises an inference that the proximate cause of the occurrence was some negligent conduct on the part of defendant. . . ."

(b) "The mere fact that an accident happened, considered alone, does not support an inference that some party, or any party, to this action was negligent."

(c) "The burden is upon the plaintiff to prove by a preponderance of evidence that defendant was negligent and that such negligence was a proximate cause of injury to the plaintiff. To establish contributory negligence, the burden is upon the defendant to prove by a preponderance of evidence that the deceased was negligent and that such negligence contributed in some degree as a proximate cause of the injury."

Instruction (a), as given by the court, added to the language quoted by appellant the following: "That inference is a form of evidence, and if there is none other tending to overthrow it, or if the inference preponderates over contrary evidence, it warrants a verdict for the plaintiff. Therefore, you should weigh any evidence tending to overcome that inference, bearing in mind that it is incumbent upon the defendant to rebut the inference by showing that it did, in fact, exercise ordinary care and diligence or that the accident occurred without being proximately caused by any failure of duty on its part." This instruction was followed by another to the effect that the provisions of Instruction (a) constituted an exception to the general rule that the mere happening of an accident does not support an inference of negligence and that under certain exceptional circumstances the exception to the rule was authorized, setting forth the circumstances.

These two instructions presented a correct statement of the doctrine of res ipsa loquitur.

The jury was also correctly informed by Instruction (c), for it is elementary that the duty cast upon a defendant to overcome a prima facie case made by the application of the res ipsa loquitur doctrine in no way changes the rule as to the burden of proof. (19 Cal.Jur. 718; see, also, *Holt* v. *Yellow Cab Co.* (1932), 124 Cal.App. 385-389-90 [12 P.2d 472].)

Instruction (b) states the general principle that the mere fact that an accident happened, considered alone, does not support an inference of negligence (*White* v. *Spreckels* (1909), 10 Cal.App. 287, 294 [101 P. 920]), but it also goes further by stating specifically that such happening would not "support an inference that *some party, or any party, to this action was negligent*" (italics ours); and while it may be argued that Instruction (a), stating, as it does, that "from the happening of the accident involved in this case . . . there arises an inference that the proximate cause . . . was . . . some negligent conduct on the part of defendant," and Instruction (b), stating that "the mere fact that an accident happened . . . does not support an inference that *some party . . . to this action was negligent*," were conflicting, we are unable to perceive how the jury was misled thereby, or how any prejudice to appellant resulted since the doctrine of res ipsa loquitur did apply and any suggestion that it did not would have been to defendant's advantage.

Nor do we agree with appellant's contention that reversible error arose when the court instructed the jury as follows:

"If, under the court's instructions, you find that plaintiff is entitled to a verdict, you will award her such sum as, under all the circumstances of the case, may be just compensation for the pecuniary loss she has suffered by reason of the death of Philip Radisich."

"*In determining that pecuniary loss, you may consider not only the financial support, if any, which plaintiff would have received from the deceased except for his death, but also the pecuniary value of the society, comfort, care, protection, and right to receive support, if any, which plaintiff has lost by reason of the death.* In weighing these matters, you may consider the age of the deceased and of plaintiff, the physical

condition of deceased and of plaintiff as it existed at the time of the death and immediately prior thereto; their respective expectancies of life as shown by the evidence; the disposition of the deceased, whether it was kindly, affectionate or otherwise; whether or not he showed an inclination to contribute to the support of the plaintiff; the earning capacity of the deceased; *and such other facts shown by the evidence as throw light upon the pecuniary value of the support, society, care, comfort and protection which the plaintiff reasonably might have expected to receive from the deceased had he lived.*" (Italics by appellant.)

Under the interpretations which have been given to the provisions of the Federal Employers Liability Act, embraced in the Jones Act, the italicized portions of the instruction if they had stood alone might be open to objection, but we do not believe that the defendant in this case suffered therefrom for immediately thereafter the court, also at the request of plaintiff's attorney, gave the jury the following instruction: "You are instructed that if your verdict is in favor of the Plaintiff. the damages to which the plaintiff is entitled to recover from defendant, is the financial loss, if any, resulting from being deprived of a reasonable expectation of pecuniary benefits. *You may not consider mental anguish, or suffering or loss of companionship in your consideration of damages or any suffering of the deceased.*" (Italics ours.) Furthermore, the record also indicates that the attorney for the plaintiff, in his opening statement to the jury, said: "I believe we will not show or attempt to show any damages by reason of loss of companionship or because of mental anguish, because under the particular Act that we are bringing this action I think the Court will instruct you in the event that you determine that the plaintiff is entitled to a verdict, you are not to fix any damages for those particular items."

In view of the fact that the plaintiff's attorney adhered to his declared intention and did not show or attempt to show any pecuniary loss other than that occasioned by the loss of earnings, we do not believe that the jury was misled in any manner by the giving of the questioned instructions. Certainly the amount awarded does not indicate that any improper rule of damages was adopted by the jury in arriving at its verdict.

Having in mind all the instructions and the entire record in this case we are not persuaded that the jury erred in its conclusion. "A judgment will not be reversed because

of the giving or refusing of instructions which do not harm the appellant. To justify a reversal, under the Constitution it must appear, from a consideration of all the evidence, that any error in this respect resulted in a miscarriage of justice.'' (2 Cal.Jur. 1026.) Since, to us, there appears no miscarriage of justice in the verdict rendered by the jury, the judgment is affirmed.

Shinn, J., and Wood (Parker), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 21, 1945. Edmonds, J., Traynor, J., and Spence, J., voted for a hearing.