[Civ. No. 14840. First Dist., Div. One. Mar. 17, 1952.]

CATHERINE MILIAS, a Minor, etc., et al., Appellants, v. WHEELER HOSPITAL (a Corporation), Respondent.

James F. Boccardo and Lewis J. Yapp for Appellants.

Bell, Anderson & Ropers and Ropers & Majeski for Respondent.

PETERS, P. J.—This is an action brought through her guardian *ad litem* by Catherine Milias, a minor, for her injuries, and by her father for his medical expense, all alleged to have been caused or incurred as a result of the negligence of the defendant, the Wheeler Hospital. The hospital is the sole defendant. At the trial the cause of action by the father was, by consent, dismissed. The jury brought in a verdict in favor of the hospital. From the judgment entered on that verdict the plaintiff appeals. Her principal contention is that the instructions on res ipsa loquitur were erroneous.

The facts are as follows: In February of 1948 Catherine was about 8½ years of age. On Lincoln's birthday she bruised the calf of her right leg while riding her bicycle. By February 14th the leg was quite painful and she was put to bed by her parents. On the 15th the leg was worse, and on the 16th her father requested Dr. Melkonian to call at the house to see the child. The doctor was told that a short time before the bicycle incident the child had had an infected thumb, which had caused a high fever, nausea, and a swelling of the right leg. He discovered that the thumb was still inflamed. He ascertained that the right leg was swollen, tender and red, that the child's heart was beating very rapidly, and that she had a temperature of 104.8. He knew that the child was desperately ill, diagnosed the condition as osteomyelitis, believed her chances of recovery were slim, and advised immediate hospitalization. The child was taken to Wheeler Hospital, where she was admitted in a semicomatose condition at 11 a. m. on February 16th. Her temperature was then 105.8. Within half an hour it had risen to 106.4. Laboratory tests confirmed the provisional diagnosis, and also showed that the blood stream had become infected with both staphylococcus and streptococcus germs. Either is serious, but when they appear together the condition is extremely dangerous. Dr. Josephson, who operated on the child on the 17th, believed that, unless she quickly responded to treatment, she would die within a few hours, and it was his belief then that she would probably die.

When Catherine was brought to the hospital Dr. Melkonian prescribed that penicillin and "force fluids" be administered, and that "continuous warm" magnesium sulphate or epsom salts compresses be applied to the right leg, together with a heating pad. The medical evidence is to the effect that for this type of bone and blood poisoning the

prescribed treatment was the best that could have been given, and no contention is made to the contrary.

The treatments prescribed by Dr. Melkonian were administered first by nurse Seifkin and then by nurse Thrasher, both employees of the hospital. Seifkin testified that when Catherine was admitted to the hospital the skin of the infected leg was clear except for a red spot above the knee, which Mrs. Milias told her had been caused by the use of a hot water bottle. Seifkin started the warm compress treatment about 2 p. m. and went off duty at 3 p. m., and was replaced by nurse Thrasher. The latter observed that the heating pad was on "low," continued it there, and continued the warm compresses until she went off duty at 11 p. m.

Dr. Melkonian saw his patient many times that day, the last time about 10:30 p. m. On each visit he observed the leg and saw no blistering. He ordered the warm compresses continued. On the morning of the 17th he observed a blister on the calf of the leg, and ordered the compresses discontinued. He testified that each time he saw the leg, compresses, and heating pad, the conditions he saw were in accord with his orders; that he was not concerned with a possible burn, but with saving the child's life; that the burn of which the child complains was simply an unexpected result of the necessary treatment; that the compresses were essential to save the child's life; and that the burn was as much the result of the child's general condition as anything else.

When nurse Thrasher went off duty at 11 p. m. on February 16th, she was replaced by nurse Pyle, who was employed by Mr. Milias, and who was not an employee of the hospital. Her testimony was not too clear. She testified that when she came on duty, Catherine's condition was very poor. Her leg was red and swollen, and under the moist dressing was one large blister and several smaller ones. She stated that she called these blisters to the attention of some unidentified nurse, and she did enter, on the patient's medical report, a statement about the blisters. On direct examination she could not remember whether the heating pad was being used when she came on duty, and on cross-examination stated that it was not then being used. But she testified that the dressings on the leg were then "hot." She stated that she could not remember whether she continued the hot compresses, but she was positive that she carried out the doctor's orders, and the order sheet called for compresses. She also testified

that she may have discontinued the compresses after she discovered the blisters.

These various measures were successful in bringing the poisoned condition to a head, and in limiting its diffusion. Dr. Josephson, an orthopedic surgeon, drained the infected area on the 17th, and removed a cup and a half of pus. He found the soft tissue of the leg extensively infected. He testified that all concerned were engaged in an all-out effort to save Catherine's life, and that heat on the leg was necessary in this effort. He also testified that frequently in cases of osteomyelitis, scar tissue of the type on Catherine's leg develops. In a letter to counsel he had stated that when he observed the patient she had a badly swollen leg, that there was a red area "evidently of thermal origin" on the calf; that the compresses had brought the condition to a head, and thus limited the area of infection; that it was too bad that the patient was in such a condition that she did not feel the overhot applications; and that no great amount of tissue was destroyed by the burn. He testified that the infection from which Catherine suffered would affect the amount of heat that she could take, and that even a compress of 100 degrees Fahrenheit might cause a reaction to a massively infected area.

A plastic surgeon, Dr. Brock, first testified that the condition could have been caused by a thermal agent externally applied, and that Catherine had a third degree burn, but also testified that the scarring could have been caused by the osteomyelitis.

All of the testimony is to the effect that at all times the electric heating pad was on "low" temperature.

Catherine made a complete recovery, after some 23 days in the hospital. She has full use of her legs, and has no limp. The scars are not obvious if she wears hose.

The trial court instructed on the doctrine of res ipsa loquitur but did so in such a way as to leave to the determination of the jury whether or not it would apply the doctrine. It is asserted by appellant that this was error and that the trial court should have instructed, as a matter of law, that the doctrine was applicable.

There can be no doubt that factually the case is one where the doctrine may be applicable. (*Ybarra* v. *Spangard*, 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258]; *Engelking* v. *Carlson*, 13 Cal.2d 216 [88 P.2d 695]; *Huffman* v. *Lindquist*, 37 Cal.2d 465 [234 P.2d 34]; *Timbrell* v. *Suburban Hospital*,

*Inc.,* 4 Cal.2d 68 [47 P.2d 737] ; *Meyer* v. *McNutt Hospital,* 173 Cal. 156 [159 P. 436] ; *Dierman* v. *Providence Hospital,* 31 Cal.2d 290 [188 P.2d 12].)  The elements of the doctrine are thus summarized in *Ybarra* v *.Spangard, supra,* at page 489 : ''The doctrine of *res ipsa loquitur* has three conditions: ' (1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff.'  (Prosser, Torts, p. 295.)  It is applied in a wide variety of situations, including cases of medical or dental treatment and hospital care.   [Citing cases.] ''

The trial court first instructed as to the elements of the doctrine.  No complaint is made of that instruction.  Then the court gave the following instruction : ''Under the circumstances just mentioned the defendant will not be held blameless except upon a showing, either (1) of a satisfactory explanation of the accident, that is, an affirmative showing of a definite cause for the accident, in which cause no element of negligence on the part of the defendant inheres, or (2) of such care in all possible respects as necessarily to lead to the conclusion that the accident could not have happened from want of care, but must have been due to some unpreventable cause, although the exact cause is unknown.  In the latter case, inasmuch as the process of reasoning is one of exclusion, the care shown must be satisfactory in the sense that it covers all causes which due care on the part of the defendant might have prevented.''

Appellant urges that by reason of the phrase ''Under the circumstances just mentioned'' the application of the doctrine was left to the discretion of the jury.  She offered an instruction, which was refused, to the effect ''You are instructed that the accident in this case is of such a character that it speaks for itself.  Under such circumstances the defendant will not be held blameless except upon a showing'' etc., and contends that such instruction should have been given.  The thought expressed by appellant is that if instructions on res ipsa loquitur are given, it must be assumed that all the elements which bring the doctrine into operation are present, and that it should not be left to the jury to apply the doctrine or refuse to do so.

Appellant also complains of an instruction that starts off ''If, and only in the event you should find that there was

an accidental occurrence as claimed by plaintiff . . . then from the happening of the accident involved there arises an inference'' etc. Appellant contends that her offered and rejected instruction to the effect that ''From the mere happening of the accident involved in this case, as established by the evidence, there arises an inference'' etc. should have been given.

Undoubtedly the challenged instructions left to the jury the question of whether or not, under the facts, the doctrine should be applied. Such instructions correctly stated the law. The burden is on the plaintiff to make out a case from which the jury, on the basis of experience, may draw the conclusion that negligence is the most likely explanation. In doing this, the plaintiff may be aided by certain inferences such as that involved in the doctrine of res ipsa loquitur. But such inferences are based on common experience. To be entitled to the inference the plaintiff must prove, by a preponderance of evidence, the facts that give rise to it. If such facts are uncontradicted, then, of course, the court instructs that the inference arises. But if, as here, the facts that give rise to the inference are in dispute, then, before the inference can arise, the jury, and not the court, must pass on this disputed question of fact.

One of the basic facts that the plaintiff must prove before the doctrine is applicable is that the occurrence is one that ordinarily does not happen unless there was negligence. On this issue plaintiff produced enough evidence which, if believed, would give rise to the doctrine. But there was substantial evidence that, without negligence, scarring such as here occurred was a normal and natural result of the necessary treatment or of the osteomyelitis and blood poisoning, or that her condition was such that she was unable to stand the warmth necessary to save her life. In other words, if this evidence was believed, no ''accident'' at all occurred. If the jury believed this evidence, the inference would not arise. There was also the question of whether the hospital, the sole defendant, was in control of the patient when the burn occurred, that is, whether the hospital nurses or nurse Pyle, hired by Mr. Milias, was in charge. These were jury questions. (See generally, Prosser, Res Ipsa Loquitur in California, 37 Cal.L.Rev. 183, 194; *Moore* v. *Belt,* 34 Cal.2d 525 [212 P.2d 509] ; *Gordon* v. *Aztec Brewing Co.,* 33 Cal.2d 514 [203 P.2d 522] ; *Juchert* v. *California Water Service Co.,* 16 Cal.2d 500 [106 P.2d 886] ; *Nelson* v. *Painless Parker,* 104

Cal.App. 770 [286 P. 1078]; *Welch* v. *Sears, Roebuck & Co.*, 96 Cal.App.2d 553 [215 P.2d 796]; *Biondini* v. *Amship Corp.*, 81 Cal.App.2d 751 [185 P.2d 94].)

If appellant were correct, the trial court could instruct on res ipsa loquitur only where it could be said, as a matter of law, that all the conditions giving rise to the doctrine are present. That is not and should not be the law. There are many cases, such as the instant one, where the existence or nonexistence of the conditions giving rise to the doctrine are questions of fact which must be decided by the jury before the doctrine is applicable at all. The challenged instructions correctly stated the law.

The appellant also challenges the sufficiency of the evidence to support the verdict. The summary of the evidence already given demonstrates that there was convincing and substantial evidence to support the implied finding that negligence was not present in this case.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.