[Civ. No. 16461. First Dist., Div. One. Dec. 8, 1955.]

EVELYN B. SHERMAN, Appellant, v. RODNEY B. HARTMAN et al., Respondents.

Carroll F. Jacoby and Jack Flinn for Appellant.

George A. Smith, Peart, Baraty & Hassard, Lamb, Hoge & Killion and Lamb & Hoge for Respondents.

BRAY, J.—In a malpractice action, defendant Taylor, individually and doing business as San Rafael General Hospital,[1] was granted a judgment of nonsuit. The jury rendered a verdict in favor of defendant Hartman,[2] and judgment was entered thereon. Plaintiff appeals from both judgments.

### QUESTIONS PRESENTED

1. Should the court have instructed the jury on res ipsa loquitur (a) under the facts; (b) under the pleadings?

2. Was there evidence of the hospital's negligence to go to the jury? Included in this question is that of whether res ipsa loquitur applies.

### EVIDENCE

February 18, 1953, plaintiff entered the hospital for the purpose of a hysterectomy, an abdominal operation to be performed by defendant, a physician and surgeon. She had been under his care for some time. The next morning defendant operated. He was assisted by Dr. Robinson, Dr. Miller (anesthetist) and the usual scrub and surgical nurses. The pulse, blood pressure and general condition of the patient were in charge of Dr. Miller, who administered the anesthetic. Because of blood loss and shock Dr. Miller started transfusion of one pint of whole blood (500 c.c.'s). To do this he inserted a needle into the vein of the right arm, fixed it in place by pieces of adhesive tape, then placed the arm on a board and held it there by use of adhesive tape or a towel. The operation started about 10:20 a. m. and about 12 noon plaintiff was moved to her room, defendant and Dr. Miller accompanying her. Dr. Miller in defendant's presence checked and found

---

[1]Hereafter referred to as "the hospital."

[2]Defendant Hartman will be referred to as "defendant."

the transfusion still running. The two doctors then went to change their clothes. On returning to her room defendant "didn't care too much for her condition." He brought Dr. Miller into the room, and after checking the transfusion the latter assured him her paleness and clamminess was the condition she had been in for some time, and he was not alarmed; her blood pressure came back up and her pulse was good and "we both felt a whole lot better about it." Dr. Miller testified that the reason he checked the transfusion twice was "We felt she was in a state of shock and we were concerned about her." Defendant instructed the nurse whom they left in charge "to watch the blood pressure as I was a little worried about her condition." Defendant expected the nurse to remain there as long as the blood was dripping, although plaintiff's condition was not critical and she could have been left alone as he did not expect her to come out of the anesthetic for a couple of hours. At this time she probably had received about half of the blood in the bottle. Defendant did not specifically tell the nurse to remain. He took it for granted that she would, as that was normal hospital procedure. The doctors left. From then on plaintiff was under the care of hospital personnel. According to the hospital records the needle came out of the vein about 12:30 p. m. According to a Mrs. Barker, a patient in the same room, after the doctor (which one does not appear) had put up the bottle after bringing plaintiff in the room, and saw that it was working, and had left, the nurse said it was dripping slowly, almost stopped, and she shook it a couple of times. Plaintiff started coming out of the anesthetic "a little bit" and started moving her head "a little bit" and was vomiting "a little bit." The nurse stayed about half an hour and then a male nurse or orderly came in. The female nurse said that she had to go to lunch and asked him to watch plaintiff until she came back. She asked him if he was a registered nurse. He replied, "uh-huh, or kind of shook his head, kind of mumbled. She said, 'You know about the blood transfusion, watch her for me' . . ." He watched plaintiff a couple of times; she got restless "a little bit" and he told her to keep quiet. After he had watched her about a half-hour he said, "The needle seems to be coming out," and asked the witness to ring the bell. She rang twice and called once, and it seemed a long time before a nurse came. The male nurse said, "Look, look it is coming out." A little while afterwards one of the doctors came and they started the dripping again.

All the time that plaintiff was in the room someone was watching her, first the female and then the male nurse. Defendant was not called when the needle came out. He returned about 3 p. m. and found that plaintiff's arm was "swollen and discolored from needle getting out of vein probably when she began to arise and come to." She had a "Painful infusion of blood into right arm from leaking blood." These were his entries in the hospital record, although he testified it never was determined how the needle happened to come out of the vein. The needle coming out of the vein caused about 200 c.c.'s of blood to go into the soft tissues.

Plaintiff testified that after coming out of the anesthetic her arm was black, swollen and painful. The condition started at the wrist and went up her arm. When she asked defendant what happened he said that "the blood from the transfusion had gone into the tissues and that as far as he was concerned, it was pure carelessness." He did not say who was careless. Defendant denied this conversation.

1. *Instruction on Res Ipsa Loquitur.*

(a) Under the facts.

This action is solely for the injury to plaintiff's arm caused by the alleged negligence in connection with the transfusion. Should the court have given plaintiff's offered instruction on res ipsa loquitur?[3]

Defendant, Dr. Miller and Dr. Goddard testified that it was standard practice for the surgeon to leave a patient with blood transfusion running and in charge of a nurse. All three doctors testified that it is a frequent occurrence for a needle to come out of the vein during a transfusion. They had seen it occur on many occasions. Dr. Miller testified it can occur even though the patient is getting the best of care. Usually when the needle comes out of the vein the blood does not flow into the tissues. It is rare when it does so and then it only flows from 10 to 25 c.c.'s. Defendant testified that in his 15 years of experience, although the needle had come out of the vein in transfusions many times, this was the first time there was any residual; the blood in the tissues generally left in two or three days. There is no testimony to the contrary of these statements of the three doctors.

Negligence on the part of a physician or surgeon will

[3]The doctrine as applicable to the case against the hospital will be discussed later.

not be presumed; it must be affirmatively proved. ■ However, the doctrine of res ipsa loquitur is applied in malpractice cases if it appears " 'either as a matter of common experience or from evidence in the case, that the accident is of a type which probably would not happen unless someone was negligent.' " (*Costa* v. *University of California,* 116 Cal. App.2d 445 [254 P.2d 85].) ■ It is unnecessary to determine here whether the common experience of a layman in blood transfusion cases is that the results here do not occur without negligence, for the reason that the expert testimony of all the doctors, in addition to plaintiff's testimony that defendant told her someone had been negligent, was that, while in transfusions the needle frequently comes out of the vein, causing a small amount of blood to get into the soft tissues, it does not cause the condition of plaintiff's arm. Thus, the first element required for the application of the doctrine was present, namely, the accident is one which ordinarily does not occur in the absence of someone's negligence. (See *Milias* v. *Wheeler Hospital,* 109 Cal.App.2d 759, 764 [241 P.2d 684], for this requirement.) ■ Two other elements are necessary: (1) that the accident is not due to any voluntary action or contribution on plaintiff's part. This element was present as plaintiff was under the influence of the anesthetic administered by direction of defendant and her involuntary movements while coming out were usual and expected. ■ (2) The accident was caused by an agency or instrumentality within the exclusive control of defendant. This is the missing element. Defendant, finding that the transfusion was working properly in accordance with good medical practice, left the patient in the hands of a registered nurse provided by the hospital. He had the right to assume that being a registered nurse and provided by the hospital she had the requisite training and knowledge to perform the simple act of watching the transfusion and seeing that if the needle slipped as needles frequently did, the dripping of blood was stopped and a doctor called to again insert the needle.[4] Thus, at the time of the injury, defendant did not have exclusive or any control of the instrumentality. It is true that defendant was in charge of the patient and generally of the nurses who attended her, but not to the extent of responsibility for routine matters performed in his absence by

---

[4]That this watching of the patient does not require great skill is attested by the uncontradicted testimony that on occasion a patient's husband or friend does it rather than a nurse.

a nurse not selected by him but provided by the hospital. To hold him so responsible would require him to remain with the patient until the transfusion was complete in order to make sure that the nurse, whom he did not select, properly performed her duties. To require a surgeon to do this, a matter which did not require the skill of a physician or surgeon, would be so time-consuming as to make the already burdensome cost of medical treatment almost prohibitive.

Plaintiff contends that defendant is responsible for the acts of the nurse, basing her contention on the following language from *Ales* v. *Ryan,* 8 Cal.2d 82, 105 [64 P.2d 409]: ''A physician is answerable for the acts of another, operating jointly, for the acts and omissions of the other which, exercising reasonable diligence, he should have observed. (*Wynne* v. *Harvey, supra* [96 Wash. 379 (165 P. 67)].) The same rule would apply to nurses working under his direction.'' There, however, the failure of the nurses to count the sponges was during the operation and in the very presence of the surgeon operating. Certainly the operator has exclusive control of the nurses in the surgery and while he is there. The same is true while the nurses are with the patient in his presence. In *Ybarra* v. *Spangard,* 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258], the court refers to the Ales case, *supra,* and states that the nurses ''become the temporary servants or agents of the surgeon in charge *while the operation is in progress . . .*'' (P. 492; emphasis added.)

■ The true rule in this respect is set forth in *Hallinan* v. *Prindle,* 17 Cal.App.2d 656, 661-662 [62 P.2d 1075]: ''The rule is thus laid down in 48 Corpus Juris, Physicians and Surgeons, section 114, page 1137: 'A physician is not liable for the negligence of hospital or other nurses, attendants or internes who are not his employees if he has no knowledge thereof, or has no connection therewith, or if it is not discoverable by him in the exercise of ordinary care, or unless he is negligent in permitting them to attend the patient.' [Citations.] 'But it has been held that where a hospital nurse, although not in the regular employ of an operating surgeon, is under his special supervision and control during the operation the relation of master and servant exists, and that the surgeon is liable under the doctrine of *respondeat superior* for the nurse's negligence.' (Citing *Aderhold* v. *Bishop,* 94 Okla. 203 [221 P. 752, 60 A.L.R. 137].)''

The latter exception to the general rule is the one which was applied in the Ales case. In the Hallinan case the nurse in charge of the hospital operating room had been requested

by the defendant surgeon to prepare the room for a minor operation and to prepare a 1 per cent solution of novocaine which the surgeon intended to use as a local anesthetic. By mistake, she placed on the tray to be used at the operation a 4 per cent solution of formalin, which the surgeon injected in the patient, assuming it to be the novocaine he had ordered. The court held that the evidence showed that it was the custom of physicians and surgeons to accept from graduate trained nurses medicines, instruments and drugs without making an examination thereof themselves, and that the nurse in preparing the tray's contents for the operation was not the servant, employee or agent of the doctor and that he was not liable for her negligence.

The court properly refused to instruct on res ipsa loquitur.

(b) Under the pleadings.[5]

The complaint alleged the insertion of the needle in plaintiff's arm for the purpose of blood transfusion, that then defendants carelessly and negligently left plaintiff alone and unattended; that by reason of the negligent manner in which the needle was inserted, and while plaintiff was unconscious, alone and unattended the needle became disengaged, discharging blood into the tissues of plaintiff's arm, and that the aforesaid negligence caused plaintiff's injuries.

The general rule is that unless negligence is pleaded generally the doctrine of res ipsa loquitur is not applicable. (See *Leet* v. *Union Pac. R. Co.,* 25 Cal.2d 605, 617 [155 P.2d 42, 158 A.L.R. 1008], and the many cases there cited.) However, there is considerable confusion in the cases as to what constitutes the pleading of special acts of negligence so as to deny the application of the doctrine. (See *Freitas* v. *Peerless Stages, Inc.,* 108 Cal.App.2d 749 [239 P.2d 671, 33 A.L.R.2d 778], and cases collected by Prosser, *Res Ipsa Loquitur in California,* 37 Cal.L.Rev. 183, 214.) In the following cases it was claimed that the complaint pleaded specific rather than general acts of negligence and that therefore the doctrine was not applicable, yet the court held that it was: *Jianou* v. *Pickwick Stages System,* 111 Cal.App. 754 [296 P. 108], where the complaint alleged that the defendant " 'so carelessly and negligently operated and conducted its said automobile stage that a wheel broke or collapsed thereon.' " (P. 757.) *Lawrence* v. *Pickwick Stages, N. D., Inc.,* 68 Cal.App. 494

---

[5]This question applies to the cases against both defendant and the hospital.

[229 P. 885], where the complaint alleged that the defendant " 'so carelessly and negligently operated said bus thereby causing said bus to leave the highway and turn into a ditch with great force and violence.' " (P. 497.) *Damgaard* v. *Oakland High School Dist.*, 212 Cal. 316 [298 P. 983], where the complaint at considerable length specified the defendant's acts of negligence. In fact, the court referred to the complaint as "unnecessarily prolix." (P. 319.) *Radisich* v. *Franco-Italian Packing Co.*, 68 Cal.App.2d 825 [158 P.2d 435], where the complaint pleaded negligence both generally and specifically. There the court said that the allegation that the plaintiff's " 'apron was caught . . . and drawn into the drum of the ship's winch throwing . . . [him] against the deck of said vessel . . .' . . . is but a general allegation of negligence on the part of the defendant, for it does not attempt to set out or explain in any manner the 'underlying cause' of the accident or the specific manner in which it occurred. [Citing cases.]" (P. 838.) *Vertson* v. *City of Los Angeles*, 116 Cal.App. 114 [2 P.2d 411], where the complaint alleged that the defendant " 'carelessly . . . constructed and maintained said power line and the fastenings of the wires thereto to the cross-bars, and the cross-bars to the poles upon which the said power line was suspended and . . . the wires thereof, a short distance from the cross-bars on the said described Pole 3, broke and fell on, the' " plaintiff. (P. 122.) *Mintzer* v. *Wilson*, 21 Cal.App.2d 85 [68 P.2d 370], where the complaint alleged that the ceiling which fell on the plaintiff " 'was of a faulty construction and its condition had been allowed to become defective and unsafe by the defendants through their failure to properly operate, manage, control and maintain said building in which said hotel was conducted.' " The court said (p. 89): "As will be noted, the foregoing allegations do not attempt to explain or set out in detail wherein the construction of the ceiling was faulty, nor to state specifically the reason why it fell. The allegations are therefore nothing more than general allegations of negligence." In *Freitas* v. *Peerless Stages, Inc.*, *supra*, 108 Cal.App.2d 749, the complaint charged that the defendant " 'so negligently and carelessly drove and operated said Peerless bus that the same was caused suddenly and violently to jerk, bump and stop; that as the proximate result of the negligence and careless operation of said bus by defendant' " the plaintiff was knocked to the floor. (P. 753.) We there held that such an allegation within the meaning of the cases there cited was either a general allega-

tion or a mixture of general and specific, and that in either event the doctrine was applicable. *Ybarra* v. *Spangard, supra,* 25 Cal.2d 486, 493, pointed out that there has been a liberalization of the tests for res ipsa loquitur and that the doctrine ''of res ipsa loquitur 'should apply with equal force in cases wherein medical and nursing staffs take the place of machinery and may, through carelessness or lack of skill, inflict, or permit the infliction of, injury upon a patient who is thereafter in no position to say how he received his injuries.' ''

The test between allegations of general and specific negligence seems to be whether the allegations show that the plaintiff knows the specific or underlying cause of the accident or is ignorant thereof. In the latter event the allegations, although they may refer to specific matters in connection with the accident, are held to allege general negligence.

Another way of stating the test appears in *Leet* v. *Union Pac. R. Co., supra,* 25 Cal.2d 605, where after citing cases in this state which hold that the doctrine may be invoked ''even though plaintiff specifically pleads the acts of negligence and does not allege negligence generally'' (p. 618) the court said that if the defendant is advised by the pleading that he must meet an inference of negligence (res ipsa loquitur) whatever may be the acts or omissions charged, then the charge is general enough to allow the application of the doctrine. The court further stated that allegations in the complaint of facts from which it appeared that the defendant was in a better position to explain what occurred than the plaintiff, such allegations were a factor in determining whether the doctrine should be available or would be one of the reasons for applying it. (P. 619.) All of the elements of these tests are present in our case.

In our case the complaint, like the complaint in *Radisich* v. *Franco-Italian Packing Co., supra,* 68 Cal.App.2d 825, 838, does not attempt to set out or explain in any manner the ''underlying cause'' of the accident or the specific manner in which it occurred. Here, too, the language in *Jianou* v. *Pickwick Stages System, supra,* 111 Cal.App. 754, 757 [296 P. 108], is applicable: ''It is inferred from the language employed that the plaintiff was ignorant of the specific acts of negligence which caused the accident.'' It is alleged that while she was unconscious and due to negligence the needle came out causing the injury; thus the plaintiff was unaware of the specific cause of the accident. There were sufficient allegations of general negligence to make the doctrine applicable.

Nor did the fact that plaintiff proved specific acts of negligence prevent the application of the doctrine. "The more recent and better reasoned cases hold that proof of specific acts of negligence does not preclude the application of the doctrine except where the proof dispels the inference of negligence as a matter of law." (*Freitas* v. *Peerless Stages, Inc., supra,* 108 Cal.App.2d at p. 756; see also *Leet* v. *Union Pac. R. Co., supra,* 25 Cal.2d 605, 621.)

2. *Hospital's Negligence.*

A different situation from that in the case against defendant is found in that against the hospital because (a) the doctrine of res ipsa loquitur would apply against it and (b) there was evidence of negligence on the part of its employees.[6]

(a) Res ipsa loquitur.

What we have said before concerning the presence of two of the elements of the doctrine applies to the hospital's case. The third element, that of exclusive control, is also present. At the time the nonsuit was granted neither Dr. Miller nor Dr. Goddard had testified. However, the before-mentioned testimony of defendant and of plaintiff and Mrs. Barker had been given. From it there was evidence that the exclusive control of the patient and the transfusion apparatus was in the nurse and then the orderly, both of whom were employees of the hospital. The hospital would be liable of course under the doctrine of *respondeat superior* for their negligence, if any. (See *Ware* v. *Culp,* 24 Cal.App.2d 22 [74 P.2d 283].) While that control existed a condition of the patient resulted which ordinarily does not occur unless someone was negligent. Thus there was sufficient evidence of negligence to go to the jury and to require the hospital to explain how the condition of the plaintiff's arm occurred without any negligence on its part. In our case, as in *Ybarra* v. *Spangard, supra,* 25 Cal.2d 486, the patient on recovering consciousness finds herself injured in a manner which ordinarily would not occur unless those in charge of her at the

---

[6] A nonsuit having been granted, we must view the evidence in the light of the rule stated in *Thomsen* v. *Burgeson,* 26 Cal.App.2d 235, 239 [79 P.2d 136]: "A nonsuit or a directed verdict may be granted only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given." (Emphasis omitted.)

time were negligent. She, of course, does not and could not know what happened. An explanation is due from those who knew or should have known what occurred. As said in the Ybarra case, quoting from *Maki* v. *Murray Hospital*, 91 Mont. 251 [7 P.2d 228, 231] (p. 490): ". . . without the doctrine the maxim that for every wrong there is a remedy would be rendered nugatory, 'by denying one, patently entitled to damages, satisfaction merely because he is ignorant of facts peculiarly within the knowledge of the party who should, in all justice, pay them.' "

(b) Negligence.

 Moreover, at this point there was direct evidence of negligence on the part of the nurse. Mrs. Barker testified that the nurse, after the doctors left, felt that the blood was flowing too slowly so the nurse shook the bottle a couple of times to make it flow faster. As no explanation was given of this action a reasonable inference therefrom could be that this was the reason such an unusual quantity of blood entered the soft tissue after the needle came out of the vein. Again, when the needle came out, the orderly requested Mrs. Barker to ring the bell, as he hated to ring. There was considerable delay and Mrs. Barker had to ring twice, the orderly saying he wished they would hurry. Mrs. Barker in addition to ringing twice had to call also. Finally a nurse arrived and a little while afterwards a doctor came. A reasonable inference is that during this long delay the blood was continuing to drip into the soft tissue, causing the unusual damage, and that the delay was a negligent one. The hospital takes the position that because it is quite a common occurrence for transfusion needles to come out of the veins, res ipsa loquitur cannot apply here. Such contention overlooks the evidence that such a common occurrence does not result in the condition of plaintiff's arm. It is that unusual result that causes the doctrine to apply and to require explanation, an explanation which does not appear in the case. At least, these matters were for the determination of the jury. It cannot be said as a matter of law that there was no evidence of negligence.

 While it is true that the statement which plaintiff testified defendant made to her to the effect that her injury was due to pure carelessness was hearsay (see *People* v. *One 1950 Mercury Sedan,* 116 Cal.App.2d 746, 751 [254 P.2d 666]) and therefore would not be binding on the hospital

had it objected or moved to strike it out, the hospital's failure to do it makes it binding on it for whatever the statement may be worth. (See 19 Cal.Jur.2d 123.) However, the results herein set forth would not be changed even though the statement were completely disregarded.

The judgment in favor of defendant Hartman is affirmed; that in favor of defendant Taylor individually and doing business as San Rafael General Hospital is reversed.

Peters, P. J., and Wood (Fred B.), J., concurred.

The petition of respondent John T. Taylor for a hearing by the Supreme Court was denied February 1, 1956.