## QUINN *v.* PORTER.

Nov. 3, 1952

No. 38504      6 Adv. S. 25      60 So. 2d 797

*H. W. Gautier*, for appellant.

*Bidwell Adam, O. L. McLeod,* and *Barnett, Jones & Montgomery,* for appellee.

ETHRIDGE, J.

This is an appeal by Wallace M. Quinn, doing business as Wallace M. Quinn Fisheries, defendant below, from a judgment for $2,000 for personal injuries received by Robert Porter, plaintiff-appellee, rendered by the Cir-

cuit Court of Jackson County. Appellee, a seaman upon the boat Widgeon, filed this suit under the United States Seaman's Act of 1920 (Jones Act), 46 U. S. C. A. Sec. 688, the pertinent part of which provides: ''Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply. . . .''

The Jones Act incorporates by reference the relevant provisions of the Federal Employer's Liability Act, 45 U. S. C. A. Secs. 51-59. Under the provisions of the Jones Act, a seaman has a right of action for damages for negligence against his employer only. 1 Benedict on Admiralty (6th ed., Knauth, 1940) Sec. 25; Ibid, Vol. 4, pp. 201-203; Robinson, Handbook of Admiralty Law in the United States (1939) pp. 308 et seq. The trial court peremptorily instructed the jury that appellant was appellee's employer. We hold that this was error, and that the record shows that appellee was not working for the Quinn Fisheries.

(Hn 1) Appellant, Wallace M. Quinn, doing business as Wallace M. Quinn Fisheries (hereinafter referred to as Quinn), owned and operated a fish processing plant at Pascagoula in Jackson County, Mississippi. The plant had machinery and means for manufacturing from fresh-caught fish, fish oil and fish scrap or fertilizer. F. B. Walker and Sons, Inc. (hereinafter referred to as Walker) of Pascagoula had built and owned a boat named the Widgeon. It also had a fleet of five other fishing boats. Quinn and Walker made a verbal contract under which Walker would use its boat Widgeon to catch menhaden fish, or pogies. Walker's boat would bring each day's catch to the dock at Quinn's fish processing plant. Quinn's employees would then unload the fish and weigh them. Walker employed the captain and engineer of the boat, and the captain in turn hired the crew of 18 or 20

men, one of whom was appellee Porter. When Quinn's plant crew weighed the fish, the pay of the seamen, including appellee, was determined on the basis of $2.65 a measure, which was about 1,000 fish, 666 pounds, the equivalent of 3 1/3 barrels of fish. The crew's pay, in other words, would come from the $2.65 a measure divided among them.

Under the verbal contract between Quinn and Walker, Quinn kept all of the records concerning the quantity of fish caught, the operating expenses of the boat, the wages of the crew and officers, the grocery bills of the crew, and other similar items. Quinn would then process the fish into oil and fish scrap or fertilizer, and sell these products. Their sale price was then divided between Quinn and Walker, Quinn getting forty per cent and Walker sixty per cent of that amount. Quinn paid all of these previously mentioned bills of the boat during the fishing season, which lasted for about six months, from May through October. At the end of the fishing season, when the fish caught by Walker's boat had been processed and the value of the products determined, the 60-40 per cent division of that amount was made between them. Quinn would deduct from Walker's sixty per cent all of the expenses of operating the boat, the payroll of the crew of the boat, and other similar charges allocable to the boat, and advanced by Quinn during the season. In other words, Quinn would in effect advance to Walker the money for those expenses during the fishing season and, before settling up with Walker at the end of it, would deduct from Walker's sixty per cent all expenses of the boat, including the payroll of the crew. On the other hand, Quinn took care of all of the expenses of the operation of its own fish processing plant and of its employees in that plant from its forty per cent of the gross proceeds of the finished products. Hence under this arrangement there was no sharing of profits and losses. If Walker's boat expenses were excessive, it could very well suffer a net loss on the season's oper-

ations and yet Quinn might profit, and conversely, Quinn's expenses for the operation of its plant might result in a net loss to Quinn when Walker would profit.

The captain of the crew, Captain Harvey, kept a "Fish Book" which seems to have been a record of the daily catches of the boat and of the names of the crewmen. Other than this record, Walker kept no record of any of the catches except what Quinn furnished him. Each week, Quinn would give Walker a record of the catches of fish for that week. The captain of the boat made out the payroll for the crew. Quinn would advance those sums out of its own funds, and on each weekly payroll date would place the cash due each crewman in an envelope with the seaman's name thereon. This payroll was then given to Captain Harvey, who would distribute the payroll to the crew. Seven payroll envelopes were introduced in evidence by appellee. They showed on the outside the name of Quinn Fisheries. These envelopes showed:

"Employer

"Wallace M. Quinn Fisheries

"Pascagoula, Miss.

"Name                    Robert Porter"

They then reflected the pay period covered, gross wages, and social security and Federal income withholding tax, and pro rata cost of each crew-man's food which were deducted. McGrath, manager of Quinn Fisheries, said that these envelopes were used for a while because they had given out of Walker envelopes.

In handling the bookkeeping and advances for Walker during the fishing season, Quinn withheld from the wages of the crewmen their federal income tax, transferred it to Walker, and Walker listed the crewmen as its employees and sent the tax returns to the Federal government. Walker also sent to the Federal government its social security report and tax on all employees of the boat, listing them, including appellee, as Walker's

employees. Quinn, however, made out the social security report for Walker and sent it to Walker. The various bills incurred by the boat were paid by Quinn on its bank account, and later charged to Walker, who usually did not know of or approve these bills prior to payment. Walker paid for any gear that went onto the boat. Quinn had no control or supervision of the boat except to take the fish which were brought to the dock. Walker employed the captain and the engineer, and the captain employed the other crewmen. The bills incurred for the operation of the boat were mailed by creditors usually directly to Quinn, Quinn advanced the funds and paid those bills, kept a record of them on its books, and the account of Walker was charged for them. At the end of the season, Walker's sixty per cent of gross sales of products was charged with all boat expenses including wages and Quinn's forty per cent was charged with all costs of operation of the plant.

The foregoing facts in substance were testified to by J. E. McGrath, general manager of Quinn Fisheries. He also stated his conclusion that Porter did not work for Quinn and that Quinn had no control over him.

While Quinn and Walker were operating under the verbal agreement described above, on September 2, 1949, appellee, Robert Porter, was injured in his work as a member of the crew of the boat Widgeon. Appellee was in a small boat tied to the stern of the Widgeon, and was in the process of salting down the seine nets when the Widgeon ran into a mud-bank. Appellee charged that he was thrown across a steel rod in the boat and suffered injuries to his back; and that these injuries were caused by the negligent operation and excessive speed of the Widgeon. Appellee testified that Captain Harvey had employed him and gave him orders. He also said that McGrath acting for Quinn gave orders to the captain and that he heard him do so; that McGrath told the captain where to go and when to go out and what net to overhaul,

and that the captain would then give the mate and the crew its orders. In explanation, appellee said that when they were fishing at Apalachicola the crew had been asking the captain when they were coming back to Pascagoula, and that he heard McGrath tell the captain to bring the next fish to the plant there. Willie Goldsby, mate on the boat, and T. J. Robinson, a crewman, both made general statements that they understood they were working for Quinn, but when interrogated further both said that they were hired by the captain, and that they did not know who hired the captain. Charles S. Bell, engineer on the Widgeon, testified that the boat was owned by Walker and that Mr. Walker personally employed him; that the captain of the boat was at the wheel of the Widgeon when the injury to appellee occurred; and that the captain paid him off along with the remainder of the crew.

We do not mention some of the testimony on the issue of negligence, because the lack of an employer-employee relationship decides this case. The court instructed the jury for the plaintiff "that at the time and place of the injuries complained of the relationship of master and servant existed between the plaintiff, Robert Porter, and the defendant, Wallace M. Quinn, d.b.a. Wallace M. Quinn Fisheries". The court refused defendant an instruction submitting this issue to the jury. It thus instructed the jury as a matter of law that appellee was an employee of Quinn. Thereafter the jury returned its verdict for appellee.

We have considered carefully the testimony and documentary evidence, and have concluded that appellee failed to make a case for submission to the jury on the existence of an employer-employee relationship, and that the evidence shows that in fact such relationship did not exist between appellee and Quinn. The conclusions of the three witnesses for plaintiff on this issue are deprived of any probative value when the factual basis of the relation-

ship between Walker and Quinn is revealed by McGrath's testimony and documentary evidence. The Widgeon was owned by Walker and was one of a fleet of six vessels owned by this corporation and engaged in the catching of menhaden or pogie fish. Captain Harvey and the pilot and engineer were employed by Walker, and the captain in turn employed the crewman, including appellee. Quinn's office made disbursements under his oral contract with Walker in payment of the crew, the repairs and the expenses of the operation of the boat, as the agent of Walker, and charged every such disbursement against Walker's account. Walker ultimately, at the end of the fishing season, paid the entire expense of the operation and maintenance of the boat including the wages of the crew. Walker carried appellee on its payroll as an employee, as evidenced by the fact that its Federal income tax withholding returns and social security tax returns reflected that appellee was Walker's servant. The captain was in charge of the navigation, operation and fishing of the boat, and hired appellee and other crewmen; and in turn the captain was employed by Walker.

Plaintiff's evidence, which it might be suggested makes a case for the jury on the issue of employer-employee relationship, was of little or no probative value. For example, plaintiff, Goldsby and Robinson all admitted that they were hired by Captain Harvey. It is undisputed that Walker hired Harvey. Goldsby and Robinson said that they understood they were working for Quinn, but when interrogated further, they conceded that they did not know who had hired the captain. So their conclusions for whom they were working are of no weight. Porter testified that he saw McGrath give orders to the captain, but upon further inquiry it developed that the crew had been after the captain to return from the Apalachicola, Florida, waters to Pascagoula, and that in response to this McGrath told the captain to bring

the next load of fish to the Jackson County plant. Quinn apparently had other plants on the coast. The only other item .of evidence for plaintiff was the fact that at least for a while Quinn, in making out payrolls for the crew, placed their money in envelopes with the name of Quinn Fisheries written thereon. But McGrath's statement that Quinn had run out of Walker envelopes and was using its own temporarily is consistent with every other fact in the record. And it is undisputed that Walker paid the wages of the crew at the end of the season. The foregoing items of evidence offered by appellee were not sufficient to make a case for the jury on whether Quinn was the employer of appellee. The evidence shows that in fact Quinn was not plaintiff's employer.

With reference to the conclusions of the two crewmen who testified for plaintiff, the observation in Steele v. American-South African Line, 62 F. Supp. 636 (D. C. N. D. Calif. 1945), is pertinent: ''I cannot see how a cause of action specifically created by statute can be maintained against any party, other than the party statutorily charged with liability. Unawareness of the identity of the employer, at the time of signing on the vessel, is not, in my opinion, legally sufficient to fasten statutory liability upon a party not made responsible by the terms of the statute.''

The arrangement between Quinn and Walker does not constitute a partnership or joint adventure, because undisputedly there was no sharing of profits and losses or any agreement to do so. Sample v. Romine, 193 Miss. 706, 726-731, 8 So. 2d 257, 9 So. 2d 643 (1942); 30 Am. Jur., Joint Adventures, Secs. 12, 32, 33. Hence no joint employer-employee relationship is available for appellee. Moreover, it must be remembered that plaintiff's evidence undertakes to show that the captain was negligent, and it is undisputed that the captain was employed personally by Walker.

(**Hn 2**) The existence of the relationship of employer and employee is essential to recovery in a suit under the Jones Act, and whether or not this relationship exists is to be determined by common law tests. 4 Benedict on Admiralty (6th ed., Knauth, 1940), 1952 Supp. p. 39; Ibid., pp. 202-203; 1 Ibid., Sec. 25; Robinson, Admiralty (1939) pp. 312-313. Somewhat analogous to the present situation is Cosmopolitan Shipping Co. v. McAllister, 337 U. S. 783, 791 (1949), rehearing denied 338 U. S. 839, where the plaintiff sued a company operating a vessel under a general agency agreement for the United States. The court in holding that plaintiff was an employee of the government and not of the defendant, said: "Yet this Court may not disregard the plain and rational meaning of employment and employer to furnish a seaman a cause of action against one completely outside the broadest lines or definitions of employment or employer. We have no doubt that, under the Jones Act, only one person, firm, or corporation can be sued as employer. Either Cosmopolitan or the Government is that employer. The seaman's substantive rights are the same whoever is the employer." See also Murphy v. Parry Navigation Co., Inc., 90 F. Supp. 725 (D.C.S.D.N.Y. 1950); Lykes Bros.-Ripley S. S. Co. v. Pluto, 146 S. W. 2d 414 (Tex. Civ. App. 1940); Steele v. American South African Line, supra.

In Radisich v. Franco-Italian Packing Co., 158 Pac. 2d 435 (Calif. 1945), the packing company defendant had taken over the complete control and operation of the boat for the fishing season, employed the captain and the crew and in all respects was the owner *pro haec vice.* The court properly held that the question of whether the injured plaintiff crewman was an employee of the packing company was a question for the jury. But in the present case, none of these elements of control or hiring existed; the ship owner here hired the captain and he in turn hired and managed the crew, and the ship owner,

Walker, paid for all of the expenses of the operation of the boat.

Reversed and judgment rendered here for appellant.

*McGehee, C. J.*, and *Lee, Kyle* and *Arrington, JJ.*, concur.